**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**James LOVE, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 23, 2006.

Filed April 3, 2006.

William R. McElroy, Hatboro, for appellant.

Jacqueline M. Taschner, Asst. Dist. Atty., Easton, for Com., appellee.

BEFORE: JOYCE, BOWES, and McCAFFERY, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 Appellant, James Love, appeals from the judgment of sentence entered July 1, 2005, by the Honorable Leonard N. Zito of the Court of Common Pleas of Northampton County ("trial court"). Specifically, Appellant asks us to determine

whether the trial court made erroneous rulings on Appellant's motions seeking dismissal of the charges and a change of venue and on the introduction of certain evidence. Appellant also asks us to determine whether the trial court erred in finding that the evidence was sufficient to support Appellant's convictions of obstructing the administration of law or other government function and disorderly conduct, and that his sentence was excessive and illegal. After thorough review of the record and consideration of Appellant's arguments, we affirm.

¶ 2 The relevant facts and procedural history underlying this appeal, gleaned from the trial court opinion and the record below, are as follows. On July 8, 2004, a protection from abuse ("PFA") hearing was held before the Honorable Edward G. Smith, also of the Northampton Court of Common Pleas. Attending the hearing were Shawn Ghigliotti (the PFA petitioner), Greg Rapoli (the PFA defendant), Margaret Moyer (Rapoli's mother), and Appellant (Moyer's husband and Rapoli's stepfather). Moyer and Appellant testified on behalf of Rapoli.

¶ 3 At the conclusion of the hearing, Judge Smith ruled in open court that he was granting to Ghigliotti PFA relief against Rapoli. At that point, Moyer and Appellant became vocally agitated, angry, loud, and disruptive. The four deputy sheriffs assigned to keep order and security in the courtroom instructed Appellant and Moyer to be quiet and to return to their seats. The sheriffs' numerous requests for quiet went unheeded. Deputy Sheriff George Volpe approached Moyer in an attempt to forestall further disturbance from her. As he did so, Appellant intervened by placing his arm across Volpe's

chest in an attempt to push him back. Volpe took Appellant by the arm and escorted him from the courtroom, securing him in a waiting area adjacent to the courtroom. When two of the other deputies then escorted Moyer from the courtroom, Appellant resumed his yelling, prompting Volpe to position himself in such a way as to prevent Appellant from assisting Moyer, who was struggling against the deputies' efforts to escort her from the courtroom. Appellant's loud and angry vocalizations continued for some time thereafter.

¶ 4 Deputy Sheriff Emil Schick filed charges against Appellant, Moyer, and Rapoli as a result of the events which had occurred on July 8, 2004. Specifically, Schick charged Appellant with one count of obstructing the administration of law or other government function,[1] three counts of disorderly conduct,[2] and two counts of harassment.[3] Appellant filed omnibus pretrial motions to the charges, seeking (1) a change of venue, and (2) dismissal of all charges, because Schick purportedly lacked the legal authority to initiate criminal charges. The motion for change of venue was denied on January 10, 2005, and the motion to dismiss was denied on March 15, 2005, prior to jury selection.

¶ 5 Appellant was tried before a jury on March 15 and 16, 2005. The Commonwealth presented the testimony of the four deputy sheriffs who had been present in Judge Smith's courtroom at the time of the incident. The Commonwealth also presented the testimony of Karen Mengel, Judge Smith's court reporter on the day of the incident. Mengel had prepared the official transcript of the PFA proceeding, which included a supplement dictated by Judge Smith wherein he described the in-

---

1. 18 Pa.C.S.A. § 5101.

2. 18 Pa.C.S.A. § 5503.

3. 18 Pa.C.S.A. § 2709(a).

cidents that had occurred in his courtroom immediately after he announced his PFA ruling. Over Appellant's objection, Mengel read Judge Smith's supplemental record to the jury. Appellant did not call Judge Smith as a witness, although the Judge was available, nor did Appellant present any evidence.

¶ 6 Appellant was found guilty of one count of obstructing the administration of law or other government function, two out of the three counts of disorderly conduct, and both counts of harassment. Appellant was subsequently sentenced to one to three months' county imprisonment, one hundred (100) hours of community service, and eighteen (18) months' probation following incarceration, on the obstruction of the administration of law charge. He was also sentenced to two concurrent periods of twelve months' probation for his conviction of the two counts of disorderly conduct, to run consecutively to his sentence of probation for the obstruction of administration of law charge.[4]

¶ 7 Appellant has now filed this timely appeal in which he raises the following seven issues for our review:

I. Did the trial court err by finding that Deputy Sheriff Schick was a law enforcement officer and could properly serve as an affiant on a criminal complaint[?]

II. Did the trial court err by improperly denying a motion to recuse the Northampton County bench when the possibility existed that a member of the bench may be called as a witness at trial[?]

III. Did the trial court err by permitting the previously dictated testimonial statement of the Honor-

able Edward G. Smith to be read into evidence without giving the defendant the opportunity to confront the Honorable Edward G. Smith[?]

IV. Was the evidence insufficient to support a conviction for obstructing justice[?]

V. Was the evidence insufficient to support a conviction for disorderly conduct—engaging in tumultuous behavior[?]

VI. Was the evidence insufficient to support a conviction for disorderly conduct—hazardous or physical condition[?]

VII. Did the court penalize [Appellant] for exercising his constitutional right to a trial by imposing a sentence more harsh and excessive than the more culpable co-defendant[?]

(Appellant's Brief at 2–3).

■■■ ¶ 8 Appellant first argues that the trial court erred by concluding that Deputy Sheriff Schick possessed the legal authority to be the affiant on a criminal complaint. The evidence showed that although Schick was fully trained as a deputy sheriff, he was not trained under the particular statutory provisions relating to Municipal Police Education and Training set forth at 53 Pa.C.S.A. §§ 2161–2171, and commonly referred to as Act 120. Appellant contends that *Commonwealth v. Dobbins,* 880 A.2d 690 (Pa.Super.2005), requires that deputy sheriffs be trained under Act 120 in order to act with the authority of a law enforcement officer. As this issue is one of law, our scope of review is plenary. *Commonwealth v. Magliocco,*

4. Appellant was also fined $7500, but that fine was dropped by the court following re-

consideration of sentence.

584 Pa. 244, 247–49, 883 A.2d 479, 481 (2005).

¶ 9 There is no question that deputy sheriffs are law enforcement officers possessing the power to enforce the laws. *Commonwealth v. Lockridge*, 570 Pa. 510, 519, 810 A.2d 1191, 1196 (2002); *Commonwealth v. Leet*, 537 Pa. 89, 93–96, 641 A.2d 299, 301–03 (1994); *Dobbins*, 880 A.2d at 691–92; *Commonwealth v. Bennett*, 827 A.2d 469, 476 (Pa.Super.2003). The law enforcement powers of sheriffs and their deputies derive from the common law and have remained unabated to this day, unless specifically and narrowly limited by statute. *Dobbins, supra* at 692. *But cf. Kopko v. Miller*, —— Pa. ——, 892 A.2d 766 (2006) (holding that sheriffs and their deputies are not "law enforcement officers" for purposes of the Wiretapping and Electronic Surveillance Act, 18 Pa.C.S.A. §§ 5701–81).

¶ 10 Here, Schick issued a criminal complaint against Appellant pursuant to Pa. R.Crim.P. 504, which provides that a complaint be prepared by an "affiant." The comment to this rule establishes that an "affiant" can be a law enforcement officer, a police officer, or a private citizen. Schick, as a law enforcement officer, was therefore authorized to issue the criminal complaint against Appellant. *Lockridge, supra.*

■ ¶ 11 Law enforcement officers must nevertheless be properly trained before they can carry out their duties. *Id.* at 516, 810 A.2d at 1194. However, there is no requirement that their training be that which is specifically prescribed by Act 120. Proper training of deputy sheriffs may fall under Act 120 *or any comparable course of training. Commonwealth v. Kline*, 559 Pa. 646, 653, 741 A.2d 1281, 1284–85 (1999); *Bennett*, 827 A.2d at 476. In fact, in addition to Act 120, the laws of this Commonwealth provide for the training of deputy sheriffs pursuant to the Deputy Sheriff's Education and Training Act ("Deputy Sheriff's Act"), 71 P.S. §§ 2101–2109. This act requires that deputy sheriffs complete appropriate training of not less than 160 hours (pursuant to Section 2105 of the Deputy Sheriff's Act), and continuing education of not less than 20 hours every two years (pursuant to Section 2106 of the Deputy Sheriff's Act).

¶ 12 Further, contrary to Appellant's assertions, *Dobbins, supra*, does not stand for the proposition that "law enforcement officers" may be only those individuals trained under Act 120. Rather, in *Dobbins* we noted that the deputy sheriff who investigated the crime and made the arrest had obtained training under Act 120, and was, therefore, qualified to carry out his duties.[5] In any event, our Supreme Court's holding in *Kline*[6] unquestionably establishes that a deputy sheriff need not be trained pursuant to Act 120 if he or she received comparable training pursuant to the Deputy Sheriff's Act.

¶ 13 In the case *sub judice*, the record reflects that Schick has completed all of the training required of a deputy sheriff,

---

**5.** Furthermore, Act 120 applies exclusively to municipal police officers, campus and university police, and deputy sheriffs of a county of the second class. 53 Pa.C.S.A. §§ 2161–62. Currently, only Allegheny County meets the definition of a county of the second class. *See* The Pennsylvania Manual, Vol. 116, December 2003, Section 6–3. Act 120 does not explain why its provisions apply to sheriffs employed only by counties of the second class. *Dobbins*, 880 A.2d at 692, n. 2. The fact that Act 120 applies only to those sheriff's deputies of counties of the second class, however, does not convert all other sheriff's deputies into *non*-law enforcement officers. *Id.*, 880 A.2d at 692. As we have stated, the Deputy Sheriff's Act provides for the education of all deputy sheriffs not otherwise covered by Act 120.

**6.** *Kline*, 559 Pa. at 653, 741 A.2d at 1284–85.

including all continuing education updates pursuant to the Deputy Sheriff's Act. Thus, in accordance with *Kline,* Schick was duly authorized to carry out his duties as a law enforcement officer. Those duties include, under Pa.R.Crim.P. 504, the issuance of criminal complaints based upon information received. Because Schick was a properly trained law enforcement officer, Appellant's first argument that Schick's role as affiant on a criminal complaint was improper is wholly without merit.

¶ 14 Appellant next argues that the trial court improperly denied his (non-existent) motion to "recuse" the trial judges of Northampton County from presiding over his case. Appellant's brief cites as authority for his argument only Canon 3(C)(1) of the Pennsylvania Code of Judicial Conduct, which provides that judges should disqualify themselves in proceedings in which their impartiality might reasonably be questioned. Appellant contends that because Judge Zito was a colleague of Judge Smith, whose statements were read into the record, and also because Judge Zito had a regular working relationship with the testifying deputy sheriffs, Judge Zito's partiality was thereby reasonably placed into doubt. As Appellant's argument raises an issue of law, our scope of review is plenary. *Magliocco, supra.*

¶ 15 Here, the record shows that Appellant requested a *change of venue, not a recusal* of the Northampton County bench. Change of venue and recusal call for different prayers for relief. This is particularly evident from the fact that when a change of venue is ordered, "a judge from the county in which the complaint was filed shall preside over all proceedings in the trial court," unless "otherwise ordered by the Supreme Court." Pa.

R.Crim.P. 584(B). Appellant's argument is thus inapt, and accordingly meritless. Moreover, Appellant never established any factual basis showing bias, prejudice, or unfairness, and thus any request for recusal, had one actually been made, would have been unwarranted. *Commonwealth v. O'Shea,* 523 Pa. 384, 407–08, 567 A.2d 1023, 1034 (1989).

¶ 16 Next, Appellant argues that the trial court erred by permitting the recorded factual observations of Judge Smith to be read into the record "without giving [Appellant] the opportunity to confront [Judge Smith]." (Appellant's Brief at 10). Appellant cites only to a United States Supreme Court decision upholding the principle that criminal defendants are guaranteed the right to confront at trial witnesses testifying against them, pursuant to the Sixth Amendment of the United States Constitution.[7] Again, our scope of review is plenary. *Magliocco, supra.*

¶ 17 Appellant's argument is contemptible. The record is *replete* with the trial court's **successful efforts** to arrange for Appellant's counsel to interview and call Judge Smith as a witness. In fact, the court adjourned the trial early on March 15, 2005, so that Appellant's counsel could speak with Judge Smith and prepare for cross-examination should the judge be called as a witness. The record reflects that Judge Zito stated the following:

[Appellant's request for] adjournment is granted. In the interim, the Court has conferred with the Court Administrator and the Court Administrator has advised that Judge Smith is available to you and he will escort you to Judge Smith's chambers. I have personally spoken to Judge Smith. He's available to discuss this or any other issue which you may believe to be relevant to the

---

7.  *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

defense of [Appellant] either individually with you or in the presence of the District Attorney, if you so desire. If you wish to interview him individually for whatever purpose relevant to this trial[,] he's available to you. And he's stated while he's busy with other duties[,] he will make himself available when you are brought to his chambers. So these proceedings will be adjourned until 9 o'clock tomorrow morning to afford you an opportunity to pursue the testimony of Judge Smith.

(Notes of Testimony ("N.T."), 3/15/05, at 46–47). The trial court also ruled: "We do note that [Appellant] may call Judge Smith, if you choose to do so for any purpose relevant to [Judge Smith's remarks in] the supplemental record...." (*Id.* at 37). Appellant declined to call Judge Smith as a witness, and therefore his argument that he was prejudiced by Judge Smith's absence at trial is absurd and disingenuous.

¶ 18 Moreover, the trial court admitted Judge Smith's remarks as a present sense impression pursuant to Pa.R.E. 803(1), which provides that a "statement describing an event or condition made while the declarant was perceiving the event or condition, *or immediately thereafter*," is not a statement excluded by the hearsay rule (emphasis supplied). There is no dispute that Judge Smith recorded his statements *immediately after* he observed the events involving Appellant's behavior at and immediately after the PFA hearing. Thus, the trial court properly admitted Judge Smith's remarks and permitted them to be read to the jury.

¶ 19 Appellant next argues that the evidence was not sufficient to support his conviction of obstructing the administration of law or other government function. Our standard when reviewing the sufficiency of the evidence is "whether the

evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all elements of the offense beyond a reasonable doubt." *Commonwealth v. May*, 584 Pa. 640, 645–47, 887 A.2d 750, 753 (2005) (citation omitted). We may not weigh the evidence or substitute our judgment for that of the factfinder. *Commonwealth v. Smith*, 863 A.2d 1172, 1176 (Pa.Super.2004). Additionally, the evidence at trial need not preclude every possibility of innocence, and the factfinder is free to resolve any doubts regarding a defendant's guilt "unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." *Id.* When evaluating the credibility and weight of the evidence, the fact-finder is free to believe all, part, or none of the evidence. *Id.* For purposes of our review under these principles, we must review the entire record and consider all of the evidence introduced. *Id.*

¶ 20 Here, Appellant argues that "no one ordered" Sheriff Volpe to remove Moyer from the courtroom, and that in effect Volpe "merely took it upon himself to remove Moyer without telling anyone." (Appellant's Brief at 11). For these "reasons," Appellant concludes that his action to prevent Volpe from removing Moyer *could not* rise to the level of an intentional interference with the administration of law or other government function. Appellant argues that the Commonwealth must first prove that he *knew* he would be interfering with the administration of law or other government function before his actions could form the basis of a conviction. Appellant cites no authority in support of this argument.

¶ 21 Section 5101 of the Crimes Code provides that "[a] person commits a misde-

meanor of the second degree if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle...." In *Commonwealth v. Reed*, 851 A.2d 958, 963–64 (Pa.Super.2004), we held that the evidence was sufficient to affirm a conviction under Section 5101, where a defendant attempted to obstruct the pathway of a uniformed police officer in the common area of an apartment house after the officer had exclaimed to the defendant: "Just let me get by and do my job."

¶ 22 In the case *sub judice*, Appellant does not argue that he was unaware that Volpe was a deputy sheriff assigned to keep order in the courtroom during the PFA hearing. Indeed, the evidence shows that there could be no other conclusion but that Volpe possessed the authority to keep order in the courtroom. Volpe testified, for example, that he was assigned a position standing right in front of the judge's bench, facing the gallery pews at an angle. (N.T., 3/16/05, at 138–39). Thus, there can be no question as to Volpe's official capacity at the time of the incident. Moreover, as we established earlier in this opinion, Volpe, as a deputy sheriff, was a law enforcement officer possessing the power to enforce the laws.

¶ 23 The evidence adduced at trial uniformly reflects that Volpe and the other deputy sheriffs repeatedly instructed Moyer and Appellant to cease their public disturbance and resume their seats. Volpe described the relevant events as follows:

> As soon as Judge Smith [pronounced his] order ... against Mr. Rapoli evicting him from the residence[,] ... [Appellant] and Miss Moyer ... began acting out.

> * * * *

> Miss Moyer stood up and she began— she became highly agitated. She began

yelling in the courtroom that this wasn't right, the decision wasn't right.

> I approached her and I explained to her that she would have to remain seated in the courtroom. She did not listen to what I told her. I spoke to her several times instructing her to sit down. She did not. She began acting out, verbalizing, yelling, screaming, hollering. And I explained to her that she would now have to leave. She refused to leave, remained in the courtroom and [continued] yelling, screaming and hollering. At that time I attempted to approach her ... in order to escort her out of the courtroom[.] I had given her several verbal commands to stop her actions and to be seated and she would not comply. So[,] she had to be removed from the courtroom....

> * * * *

> I was just basically trying to keep peace within the courtroom. To keep the peace and just make everybody calm down, relax. There [were] also other people present in the courtroom. These weren't the only people in the courtroom. And, you know, when something like this happens we have to control it. We can't allow it to go on in the courtroom. It is just not acceptable to the Judge and to what [sic] we do here.

> * * * *

> After I instructed [Moyer] several times to be seated and instructed her to leave and she did not leave[,] I attempted to approach her, to escort her out of the courtroom.

> * * * *

> ... I was not [able to escort Moyer from the courtroom]. [Appellant] ... intervened and stepped alongside of me and

placed his arm out in front of me across my chest and attempted to push me back in an aggressive manner.

\* \* \* \*

[Appellant made contact with me.] His arm was placed directly across my chest. And then at that time he aggressively attempted to push me backwards.

(N.T., 3/16/05, at 139–44).

¶ 24 Quite clearly, this evidence is wholly sufficient to support Appellant's conviction for intentional interference with the administration of law or other government function. Appellant's argument that Volpe had acted in a "rogue" manner without color of recognizable authority is clearly belied by the evidence, which shows that Volpe's actions in attempting to quiet Moyer and then escort her from the courtroom were those of a law enforcement officer known to all present, who was reasonably carrying out his official responsibilities, and in an exemplary fashion. Volpe's official responsibilities to keep peace and order in the courtroom, for the safety of all present and to uphold the dignity and decorum of the court and the laws that it serves, are unquestionable. Appellant's aggressive and physical interference with Volpe's official responsibilities satisfies the elements required for a conviction under Section 5101.

■ ¶ 25 Appellant next argues that the evidence was insufficient to support his conviction for disorderly conduct based upon the elements of "fighting or threatening, or … violent or tumultuous behavior."[8] 18 Pa.C.S.A. § 5503(a)(1). Appellant contends that the evidence fails to show that he "fought with the deputies," threatened "the lives" of the deputies, "became violent with the deputies," or "did anything other than leave the courtroom peacefully when escorted by Deputy Volpe." (Appellant's Brief at 13).

¶ 26 Section 5503(a)(1) of the Crimes Code provides: "A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (1) engages in fighting or threatening, or in violent or tumultuous behavior." "Tumultuous" is not defined in Section 5503 or elsewhere in the Crimes Code. Commonly, "tumultuous" is defined as "marked by tumult"; "tending or disposed to cause or incite a tumult"; or "marked by violent or overwhelming turbulence or upheaval." Merriam Webster's Collegiate Dictionary 1272 (10th ed.1996). "Tumult" is relevantly defined as "a disorderly agitation … of a crowd usu. with uproar and confusion of voices," or "a violent outburst." *Id.* at 1271–72.[9]

¶ 27 In the case *sub judice*, all of Appellant's acts took place in a public courtroom in front of court personnel, parties and witnesses to court proceedings, and spectators. Appellant and Moyer, by their actions, monopolized this public space, preventing its legitimate use during their continuing outbursts. Appellant persisted in

---

8. The Commonwealth asserts in its brief that Appellant was *acquitted* of the charge of disorderly conduct related to fighting or threatening, or violent or tumultuous behavior. (Commonwealth's Brief at 13–14, n. 2). On the contrary, the record shows that Appellant was convicted of this crime, but was acquitted of the charge of disorderly conduct caused by the creation of "unreasonable noise." 18 Pa. C.S.A. § 5503(a)(2).

9. Words in a statute shall be construed according to their common and approved usage, unless defined by statute, or unless the words are technical words, in which case they shall be defined in accordance with their peculiar and appropriate meaning. Section 1903(a) of the Statutory Construction Act, 1 Pa.C.S.A. § 1903(a).

his behavior in an anteroom of the courtroom, from which his yelling and protests could still be heard publicly. There is no question that Appellant's behavior fits the definition of "tumultuous," as it was marked by overwhelming turbulence and upheaval. Further, Appellant and Moyer, together, created a disorderly and uproarious agitation in the courtroom. Finally, Appellant *violently* interfered with a law enforcement officer during the latter's attempts to quell the public disturbance caused by Moyer. The evidence thus fully supports Appellant's conviction for disorderly conduct under Section 5503(a)(1).

¶ 28 Appellant next argues that the evidence was insufficient to support his conviction for disorderly conduct based upon the element of creating "a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." 18 Pa.C.S.A. § 5503(a)(4). Appellant contends that "[t]here was nothing about" his behavior that created a hazardous or physically offensive condition "*after being warned not to* [engage in such behavior]." (Appellant's Brief at 14). Further, and without citation to authority, Appellant argues that the offense requires that the defendant's acts result in a condition which is "physical in nature." (*Id.*)

¶ 29 Appellant's argument is neither well-developed nor clearly articulated. We are unsure if he is arguing that once Volpe took him by the arm he became physically, if not vocally, compliant. However, under any interpretation, the evidence is clear that Appellant's actions, taken in the context of all of the circumstances, posed a risk of creating a hazardous condition.

¶ 30 First, the evidence established that Appellant's public outburst was made in coordination with that of Moyer's, in joint support of an individual who had just become the subject of a PFA order entered for the protection of another individual.

Both of the parties to the PFA proceedings were present. Appellant and Moyer had jumped from their seats while disrupting the proceedings, and thus the situation was one that posed the risk of being highly-charged and hazardous. Further, Appellant not only publicly and angrily vocalized his disagreement with the court's order, he used his comments to "exacerbate and wind ... up" Moyer. (N.T., 3/16/05, at 58). Thus, Appellant acted in a manner that only further heightened the tension and risk of a hazardous condition. It must be emphasized that Appellant's actions occurred in a crowded courtroom in which court personnel, parties and witnesses to other scheduled matters, and spectators were present.

¶ 31 Moreover, Appellant physically confronted Volpe in an effort to prevent him from carrying out his official duties. Inherent in the act of physically attempting to impede a law enforcement officer from carrying out his or her official duties in the public arena is the risk of creating a condition hazardous or physically offensive in nature. Appellant created that risk here. As we have held, "[t]he reckless creation of a risk of public alarm, annoyance or inconvenience is as criminal as actually causing such sentiments." *Commonwealth v. Reynolds*, 835 A.2d 720, 731 (Pa.Super.2003) (quoting *Commonwealth v. Lutes*, 793 A.2d 949, 962 (Pa.Super.2002)). Accordingly, we determine that the evidence was sufficient to convict Appellant of disorderly conduct under Section 5503(a)(4).

¶ 32 Finally, Appellant argues that he was "penalized" for exercising his right to trial by jury because Judge Zito imposed a harsher sentence upon him than upon Moyer, who had pled *nolo contendere* to the crimes with which she was charged. (Appellant's Brief at 15). Moyer received a probationary sentence of one year based

on her pleas of *nolo contendere* to one count of obstructing the administration of law or other government function and one count of disorderly conduct. Appellant seems to be implying in his argument that the disparity in sentences is the result of the trial court's "partiality, prejudice, bias, or ill will," caused by Appellant's assertion of his right to a jury trial. (*Id.*) Also, Appellant argues, without any elaboration or discussion, that the trial court erred by imposing two sentences for Appellant's disorderly conduct convictions. With respect to his one line "argument," Appellant cites *Commonwealth v. Williams*, 871 A.2d 254 (Pa.Super.2005), a case that discusses, *inter alia*, the issue of merger of Vehicle Code offenses for purposes of sentencing.

¶ 33 Appellant's primary argument challenges the discretionary aspects of his sentence. With respect to such challenges, the Pennsylvania Rules of Appellate Procedure require that:

> An appellant who challenges the discretionary aspects of a sentence in a criminal matter **shall** set forth in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence. The statement **shall** immediately precede the argument on the merits with respect to the discretionary aspects of sentence.

Pa.R.A.P. 2119(f) (emphasis added).

¶ 34 Appellant has failed to include the requisite Rule 2119(f) statement. A failure to include the Rule 2119(f) statement does not automatically waive an appellant's argument; however, we are precluded from reaching the merits of the claim when the Commonwealth lodges an objection to the omission of the statement. *Commonwealth v. Hudson*, 820 A.2d 720, 727 (Pa.Super.2003). Here, the Commonwealth has objected to Appellant's omission of the Rule 2119(f) statement. (Com-

monwealth's Brief at 15). Accordingly, we conclude that Appellant has waived his challenge to the discretionary aspects of his sentence. *Hudson, supra.*

¶ 35 Appellant's argument that the trial court erred by imposing two sentences for his two disorderly conduct convictions appears to challenge the legality of the sentence, and is therefore not waived because of Appellant's failure to have included a Rule 2119(f) statement. However, the argument is waived because Appellant has failed to *develop* it in a manner making meaningful appellate review possible.

¶ 36 Parties to an appeal are required to submit briefs in conformity, in all material respects, with the requirements of the Rules of Appellate Procedure, as nearly as the circumstances of the particular case will permit. Pa.R.A.P. 2101. Rules 2111 and 2114 through 2119 detail the specific requirements relevant to the brief of an appellant. Of particular importance is the provision of Rule 2119(a) that a brief must contain a developed argument augmented by citation to pertinent authorities. Arguments not appropriately developed are waived. *Commonwealth v. Burkett*, 830 A.2d 1034, 1038 (Pa.Super.2003); *Commonwealth v. Miller*, 721 A.2d 1121, 1124 (Pa.Super.1998). It is not the duty of the Superior Court to act as an appellant's counsel, and it is an appellant's responsibility to establish both the purported errors and any entitlement to relief therefrom. *Connor v. Crozer Keystone Health System*, 832 A.2d 1112, 1118 (Pa.Super.2003).

¶ 37 In the case *sub judice*, Appellant has failed to present any argument *whatsoever* regarding his statement that the trial court erred by imposing concurrent sentences for each of the two convictions of disorderly conduct. Although Appellant

cites one case as legal authority for his allegation of trial court error, he does not explain how that case supports his argument that the trial court erred in this case. It is not this Court's function to invent Appellant's argument for him, and Appellant's total failure to comply with the appellate practice rules regarding content and format of briefs on this issue renders it literally impossible for the Court to conduct meaningful appellate review. For this reason, Appellant has failed to preserve the issue of whether the trial court erred by imposing sentences on each disorderly conduct conviction.

¶ 38 For all of the above reasons, Appellant's judgment of sentence is affirmed.

¶ 39 Judgment affirmed.