J-A13039-20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | : | |
| v. | : | |
| STEPHEN LEE DUTTER, | : | |
| Appellant | : | No. 1216 EDA 2019 |

Appeal from the Judgment of Sentence Entered March 25, 2019
in the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0002114-2018

BEFORE: BENDER, P.J.E., LAZARUS, J. and STRASSBURGER, J.*

MEMORANDUM BY STRASSBURGER, J.: **FILED SEPTEMBER 04, 2020**

Stephen Lee Dutter (Appellant) appeals from his judgment of sentence imposed following his conviction for the summary offense of disorderly conduct (creating a hazardous or physically offensive condition). We vacate Appellant's judgment of sentence and reverse his conviction.

We provide the following background. On March 5, 2018, Appellant attempted to enter One Montgomery Plaza (OMP), which houses Montgomery County offices and courtrooms and is across the street from the Montgomery County Courthouse. N.T., 3/25/2019, at 5, 12. In order to enter, visitors must pass through a security checkpoint. *Id.* at 7. A sign at the building entrance stated: "Stop. Notice: For your protection beyond this

---

* Retired Senior Judge assigned to the Superior Court.

point everyone is subject to a search of their person and effects." *Id.* at 10. At the security checkpoint, visitors must empty their pockets, place their personal effects in a bin, and walk through a metal detector. *Id.* at 8. A security officer inspects items placed in the bin. If a visitor has bags, a security officer uses an x-ray machine to inspect the contents. *Id.* at 8-9. The purpose of the security procedures was to prevent visitors from entering the building with weapons. *Id.* at 8.

When Appellant entered the security line, he placed his wallet and a pack of cigarettes in the bin and proceeded through the metal detector. *Id.* at 12. He did not set off the metal detector. *Id.* Before Deputy John Foster, who was in charge of the security checkpoint at that time, could inspect Appellant's items, Appellant grabbed them. *Id.* Deputy Foster told Appellant that he needed to look at the items, and Appellant replied "Yeah, no, that's not happening." *Id.* Deputy Foster repeated that inspection was necessary, and Appellant again refused. *Id.* Deputy Foster told Appellant he would not be allowed to enter the building if he did not comply. *Id.* at 13.

Another deputy working at the security checkpoint, Deputy James Lee, told Appellant that he either needed to allow the deputies to look at his items, or he would not be allowed inside. *Id.* at 13. Appellant again refused to comply, replying, "I have court today. I'm coming in." *Id.* After another round of admonition and refusal, Deputy Lee ordered Appellant to leave the building. *Id.* at 37. Appellant did not move. *Id.* He was in an agitated state,

screaming and hollering, and calling the deputies "puppets." ***Id.*** at 14, 37. Deputy Lee placed two fingers on Appellant's chest to back Appellant out of the doorway, and Appellant left. ***Id.*** at 38-39. About 50 seconds elapsed from the time Appellant approached the security checkpoint to when he left. ***Id.*** at 41.

Immediately after Appellant left OMP, he went across the street to the sheriff's office. ***Id.*** at 43. Appellant approached the clerical worker at the front desk, Mary Hickey, and told her he wanted to file a complaint because he did not like how the deputies at OMP had treated him. ***Id.*** He claimed the deputies invaded his privacy and violated his rights. ***Id.*** Appellant was upset and got progressively louder as he spoke with Hickey. ***Id.*** Appellant also requested to speak to a supervisor. ***Id.*** Appellant got angry when Hickey explained that there was no supervisor immediately available. ***Id.*** at 44. Eventually, another office worker was able to get Captain Gregory Womelsdorf to speak to Appellant. ***Id.***

Captain Womelsdorf brought Appellant back to the office of Sergeant Rick Miles, who supervises the deputies. ***Id.*** at 50. There, Appellant met with Lieutenant Theodore Thompson and Sergeant Miles. ***Id.*** at 50-51. According to Lieutenant Thompson, Appellant was not "cursing, but he was sort of like attacking [Captain Womelsdorf, Lieutenant Thompson, and Sergeant Miles] like [they] were part of the problem ... [Appellant's speech] was inappropriate for in the courthouse." ***Id.*** at 63. After five minutes,

Lieutenant Thompson asked Appellant to leave, and Appellant did. *Id.* Sergeant Miles and Lieutenant Thompson followed Appellant from a distance as he walked back to OMP. *Id.* at 16-17, 64. As they followed Appellant into OMP, Sergeant Miles radioed Deputy Foster that if Appellant complied with the rules, he should be let inside. *Id.* at 16.

Appellant's second time at OMP security began like his initial entrance; he set his belongings in the bin, walked through the metal detector without setting it off, and refused to allow Deputy Foster to inspect his belongings. *Id.* at 17. Appellant told Deputy Foster, "Don't fucking touch my stuff." *Id.* As a result, Deputy Foster told Appellant he had to leave. *Id.* When Appellant did not move, Deputy Foster grabbed Appellant by the arms and moved him out of the building. *Id.* This interaction lasted approximately "10, 15 seconds." *Id.* at 29.

Once outside OMP, Appellant began screaming and cursing. *Id.* at 18. At that point, Lieutenant Thompson told the other officers to take Appellant into custody. *Id.* at 19. Lieutenant Thompson testified that he was not going to place Appellant under arrest for his conduct inside OMP, but when Appellant was outside "it was more like F--- you. It was bad. It wasn't like he was just complaining now. He was [cursing] ... He was loud, obnoxious, unreasonable, disorderly." *Id.* at 72. When the officers stepped outside in order to approach Appellant, Appellant ran across the street to the front of the courthouse where members of the media were stationed. *Id.* at 19.

Appellant was jumping up and down, cursing, and screaming, "Look at this. Look at this. They're violating my rights. Everybody getting this?" *Id.* at 52. Approximately two minutes after Appellant was escorted from OMP, Captain Womelsdorf took Appellant into custody. *Id.* at 32. Appellant did not fight or actively resist arrest, but he refused to follow orders to place his hands behind his back. *Id.* at 53.

Based on the foregoing, Appellant was charged with misdemeanor disorderly conduct and resisting arrest. On March 25, 2019, the trial court granted the Commonwealth's motion to amend the information to one count of disorderly conduct as a summary offense. Appellant proceeded to a bench trial that same day, at the conclusion of which he was found guilty and sentenced to a 90-day term of probation. Appellant filed a timely notice of appeal.[1]

On appeal, Appellant challenges the sufficiency of the evidence to convict him of disorderly conduct, arguing there was insufficient evidence to prove (1) he had the intent to cause public inconvenience, annoyance or

---

[1] The trial court ordered Appellant to file a concise statement pursuant to Pa.R.A.P. 1925(b) on April 22, 2019. On May 13, 2019, Appellant's counsel requested an extension, which the trial court denied on May 14, 2019. Appellant's concise statement was filed 3 days late on May 16, 2019. The trial court filed its Pa.R.A.P. 1925(a) opinion on July 1, 2019, addressing the issues raised in the untimely-filed concise statement despite its earlier ruling. "[W]here the trial court addresses the issues raised in an untimely Rule 1925(b) statement, we need not remand but may address the issues on their merits." *Commonwealth v. Brown*, 145 A.3d 184, 186 (Pa. Super. 2016). Accordingly, we can consider the merits of this appeal.

alarm, or recklessly created a risk thereof; (2) he created a hazardous or physically offensive condition; and (3) his actions served no legitimate purpose.[2] Appellant's Brief at 10.

When reviewing a challenge to the sufficiency of the evidence,

> we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. ***Commonwealth v. Moreno***, 14 A.3d 133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence and substitute our judgment for that of the fact finder. ***Commonwealth v. Hartzell***, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. ***Moreno***, [14 A.3d] at 136.

***Commonwealth v. Koch***, 39 A.3d 996, 1001 (Pa. Super. 2011). A sufficiency-of-the-evidence claim is a question of law; thus, our standard of review is *de novo* and our scope of review is plenary. ***Commonwealth v. Johnson***, 160 A.3d 127, 136 (Pa. 2017).

The disorderly conduct statute provides as follows.

> **(a) Offense defined**.-- A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

***

---

[2] Appellant initially argued on appeal that the statute as applied violated his First Amendment rights to free speech and free expression, but he acknowledged in his reply brief that this argument was waived because it was not raised prior to his appeal. Appellant's Reply Brief at 1; ***see Commonwealth v. Tejada***, 107 A.3d 788, 799 (Pa. Super. 2015) ("[I]ssues must be raised prior to trial, during trial, or in a timely post-sentence motion to be preserved for appeal.").

> (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

18 Pa.C.S. § 5503(a).

We observe that

> [t]he offense of disorderly conduct is not intended as a catchall for every act which annoys or disturbs people; it is not to be used as a dragnet for all the irritations which breed in the ferment of a community. It has a specific purpose; it has a definitive objective, it is intended to preserve the public peace; it has thus a limited periphery beyond which the prosecuting authorities have no right to transgress any more than the alleged criminal has the right to operate within its clear outlined circumference.

***Commonwealth v. N.M.C***, 172 A.3d 1146, 1153 (Pa. Super. 2017) (citation omitted).

Failure to prove either element of disorderly conduct pursuant to subsection 5503(a)(4) requires reversal. ***See Commonwealth v. Williams***, 574 A.2d 1161, 1164 (Pa. Super. 1990). Accordingly, we begin with Appellant's argument that the Commonwealth failed to prove beyond a reasonable doubt that Appellant created a hazardous or physically offensive condition. Appellant's Brief at 15-17. Based on the use of the disjunctive "or," the Commonwealth may offer evidence demonstrating that a condition was either hazardous or physically offensive. Because we agree with Appellant that the facts of this case clearly do not support a finding of a

physically offensive condition,[3] we focus on whether Appellant created a hazardous condition.

In support of his argument that his actions did not create a hazardous condition, Appellant compares the facts of his case to **Williams**, where this Court found insufficient evidence that Williams' actions created a hazardous condition. Appellant's Brief at 17. Appellant argues that because his interactions with officers were very brief and he did not physically strike the officers or resist being removed from OMP, his case is similar to **Williams** inasmuch as he did not create "a significant risk or danger of injury to anyone." **Id.** (quoting **Williams**, 574 A.2d at 1164)**.** Additionally, Appellant argues that his case is distinguishable from **Commonwealth v. Love**, 896 A.2d 1276, 1286 (Pa. Super. 2006), where this Court found that physically interfering with law enforcement's efforts to keep the peace at a courthouse created a hazardous condition. Appellant's Reply Brief at 8-10.

As applied to subsection 5503(a)(4), a hazardous condition is a condition that involves danger or risk. **Commonwealth v. Roth**, 531 A.2d 1133, 1137 (Pa. Super. 1987). "The dangers and risks against which the disorderly conduct statute are directed are the possibility of injuries resulting

---

[3] This Court has defined physically offensive conditions as "direct assaults on the physical senses of members of the public." **Williams**, 574 A.2d at 1164. Commenting on the legislative history of subsection 5503(a)(4), we have said that physically offensive conditions may be created where a defendant "sets off a 'stink bomb,' strews rotting garbage in public places, or shines blinding light in the eyes of others." **Id.** (punctuation adjusted).

from public disorder." **Williams**, 574 A.2d at 1164. In **Williams**, police were called to a residents-only parking lot at an apartment complex after Williams pulled into the lot, exited his car, removed his pants, paced nervously around the lot, and, ultimately, broke in to a resident's car. **Id.** at 1161-62. We found that Williams' actions did not create a hazardous condition because his conduct was not threatening or confrontational, and it did not create a danger by obstructing a roadway or distracting passing motorists. **Id.** at 1164.

We contrasted Williams' behavior with that in **Roth** to illustrate the distinction between conduct that gives rise to a hazardous condition by creating a risk of injury and conduct that damages property or is morally offensive but does not meet subsection 5503(a)(4). **Id.** (citing **Roth**, 531 A.2d at 1137). In **Roth**, a group of over 20 protestors attempted to enter a church, which was being guarded by ushers, on Easter Sunday. **Roth**, 531 A.2d at 1137. Prior to the incident, the protestors distributed literature and threatened "war against the [church]." **Id.** at 1136. As a result, church members feared for their safety, and ushers were stationed outside of the church in order "not [to] let the battle be fought inside." **Id.** at 1137. Police present at the church in anticipation of the protest commanded the protestors not to enter the church. **Id.** Despite the order, a protest leader called on demonstrators to attempt to enter. **Id.** When the protestors stepped toward the entrance they were arrested. **Id.** This Court found a

hazardous condition was created because, "in an emotionally charged atmosphere," the protestors' "conduct of moving towards the [] property certainly created a dangerous situation in which altercations between the demonstrators and [c]hurch members could have occurred." *Id.*

Like Williams, Appellant did not threaten anyone, obstruct a roadway, or engage in or attempt to engage in physical violence. The officers' descriptions of Appellant's conduct prior to his arrest further indicate that his behavior was annoying and obnoxious, but not dangerous. Lieutenant Thompson gave the order to arrest Appellant because, after Appellant was escorted out of OMP, Appellant looked back at the officers inside and was "going off, screaming" and cursing. N.T., 3/25/2019, at 65-66. Captain Womelsdorf arrested Appellant after observing Appellant leave OMP and run across the street to media stationed outside the courthouse while "screaming, 'Look at this. Look at this. They're violating my rights. Everybody getting this?'" **Id.** at 52-53. Deputy Foster, Deputy Lee, Lieutenant Thompson, and Captain Womelsdorf all testified that Appellant did not threaten them or engage in physical violence. **Id.** at 24, 40, 57, 72.

However, Appellant's actions are distinguishable from the facts in **Williams** because Appellant was loud and confrontational in his interactions with law enforcement. To the extent that Appellant's behavior toward the security deputies, such as calling them "puppets," N.T., 3/25/2019, at 14, 37, was provocative like the protestors' conduct in **Roth**, our holding that

- 10 -

such conduct risked inciting an altercation does not extend to verbal confrontations with law enforcement officers. *See Commonwealth v. Hock*, 728 A.2d 943, 947 (1999). We have recognized that

> the prospect of a citizen verbally abusing a police officer appears particularly objectionable. It does not follow, however, that [s]ection 5503(a) may be used as a vehicle to protect police from all verbal indignities, especially under the dubious hypothesis that officers are likely to break the law when affronted. The police must expect that, as part of their jobs, they will be exposed to daily contact with distraught individuals in emotionally charged situations.

*Id.* The defendant in *Hock* was convicted under subsection 5503(a)(1) for using words in a manner that could have triggered a violent response from an officer; however, the principle in *Hock* is instructive in the instant case. *See id.* Because the targets of Appellant's verbal indignities were trained law enforcement officers, Appellant cannot be found to have created a hazardous condition on the grounds that he risked provoking an altercation.

We next consider Appellant's argument that his conduct was distinguishable from *Love*, wherein we provided the following rationale to sustain Love's disorderly conduct conviction.

> [Love] physically confronted [a courtroom deputy] in an effort to prevent [the deputy] from carrying out his official duties. Inherent in the act of physically attempting to impede a law enforcement officer from carrying out his or her official duties ... is the risk of creating a condition hazardous ... in nature."

*Love*, 896 A.2d at 1286.

Love's physical confrontation with the deputy took place in a crowded courtroom immediately after a protection from abuse (PFA) order was

entered against Love's son. *Id.* Love and his wife jumped from their seats and loudly protested the outcome. *Id.* Love "not only publicly and angrily vocalized his disagreement with the court's order, he used his comments to" escalate his wife's anger, *Id.*, thereby instigating an "uproarious agitation in the courtroom." *Id.* at 1285. "[T]he situation was one that posed the risk of being highly-charged," and Love's actions "further heightened the tension" between the parties to the PFA matter. *Id.* at 1286. Four courtroom deputies instructed Love and his wife to return to their seats and be quiet multiple times, but they did not obey the officers. *Id.* at 1279. When a deputy approached Love's wife to escort her from the courtroom, Love "intervened and stepped alongside of [the deputy] and placed his arm out in front of [the deputy] across [the deputy's] chest." *Id.* at 1284-85. Love then "aggressively attempted to push [the deputy] backwards," which required the deputy to restrain Love and rendered the deputy unable to remove Love's wife from the courtroom. *Id.* at 1285.

Although the instant case resembles *Love* in that it involves outbursts directed at law enforcement in a public building, we agree with Appellant that his case is distinguishable because he did not aggressively push or otherwise physically touch law enforcement. Appellant's Reply Brief at 9. Love "violently interfered with a law enforcement officer during the latter's attempts to quell the public disturbance caused by [Love's wife]." *Love*, 896 A.2d at 1286. The risk that the officer in *Love* would be prevented from

carrying out an official duty was not incidental to Love's conduct; stopping the officer from keeping the peace was the purpose and direct effect of physically blocking the officer from reaching his wife. *Id.* at 1284-85. Here, Appellant angrily argued with security deputies and had to be escorted from OMP, but Appellant did not block the security checkpoint or directly interfere with the search of another visitor to OMP. Furthermore, Appellant did not violently confront a law enforcement officer. Accordingly, Appellant's actions did not create a hazardous condition by physically preventing law enforcement from carrying out a duty.

The Commonwealth urges us to apply *Love*'s holding to the instant case because Appellant's behavior required deputies to leave their posts, which "inherently creates a hazardous condition as it necessarily depletes the manpower available in the moment to provide the requisite courthouse security." Commonwealth's Brief at 13. Proving that a hazardous condition was created does not require showing that public injury actually happened; however, the Commonwealth must show that Appellant's actions created a risk of public injury. *Williams*, 574 A.2d 1161, 1164. The Commonwealth argues that an action which renders law enforcement unable to provide the level of security necessary to prevent a security breach creates the risk of public injury resulting from such a breach. Commonwealth's Brief at 13. The Commonwealth contends that OMP security being rendered inadequate can be inferred from the fact that officers had to attend to Appellant. *Id.* The

record establishes that staffing for the OMP security checkpoint includes backup deputies in addition to the officer running the checkpoint, and at least one additional deputy who did not interact with Appellant was working the checkpoint when Appellant entered OMP. N.T., 3/25/2019, at 36. Of the four officers who testified, including Lieutenant Thompson who was responsible for overseeing courthouse security and assigning deputies to their posts, none stated that law enforcement capacity was strained or limited, or that any checkpoints were closed as a result of incidents with Appellant. *See Id.* at 61. Additionally, it was within the scope of the deputies' normal duties to remove Appellant from OMP and participate in his arrest. *Id.* at 31. Moreover, to the extent officers were distracted or pulled away from other assignments, any disruption was very brief. In total, both of the incidents inside OMP and Appellant's conduct outside OMP lasted for under three minutes. *Id.* at 28, 32, 41. Therefore, the record does not support the inference that Appellant's actions rendered law enforcement unable to provide the requisite security. As such, Appellant's actions did not create the risk of injury inherent in an inadequately secured public building. Accordingly, we are unpersuaded by the Commonwealth's argument.[4]

---

[4] Insofar as the Commonwealth argues that, notwithstanding the actual impact Appellant had on OMP's ability to provide security, Appellant created a hazardous condition because his actions created the risk that OMP would be unable to provide the requisite security, which in turn would create the risk of public injury resulting from a security breach, we are likewise unpersuaded. *See* Commonwealth's Brief at 12-13. The Commonwealth

*(Footnote Continued Next Page)*

Based on the foregoing, even after viewing all of the evidence in the light most favorable to the Commonwealth, we nonetheless conclude there was insufficient evidence to enable the trial court to find that Appellant created a hazardous or physically offensive condition. Because creating a hazardous or physically offensive condition is a necessary element of disorderly conduct pursuant to subsection 5503(a)(4), we do not address Appellant's remaining issues. Accordingly, we vacate Appellant's judgment of sentence and reverse his conviction.

Judgment of sentence vacated. Conviction reversed.

President Judge Emeritus Bender joined in this memorandum.

Judge Lazarus concurs in the result.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/4/20

---

*(Footnote Continued)* ───────

cannot sustain its burden of proving Appellant created a hazardous condition on the basis that addressing Appellant's conduct could have had the indirect effect of causing the officers involved to be delayed in responding to unrelated security issues. *See Id.*; ***Williams***, 574 A.2d at 1164 ("The Commonwealth reasons that ... police officers investigating the incident may not have responded as promptly to other calls. This argument proves too much.... We cannot uphold appellant's conviction based upon speculation concerning the indirect effects of actions taken by the police in the normal course of their duties.").