J-S03024-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ELIJAH JIHAD EASTERLING | : | |
| | : | |
| Appellant | : | No. 399 WDA 2020 |

Appeal from the Judgment of Sentence Entered February 25, 2020
In the Court of Common Pleas of Blair County Criminal Division at No(s):
CP-07-CR-0000829-2019

BEFORE:   DUBOW, J., MURRAY, J., and STRASSBURGER, J.[*]

MEMORANDUM BY MURRAY, J.:                    **FILED FEBRUARY 24, 2021**

Elijah Jihad Easterling (Appellant) appeals from the judgment of sentence imposed after a jury found him guilty of obstructing administration of law and disorderly conduct.[1]  Upon review, we affirm.

On February 16, 2019, Altoona Police Department officers responded to a 911 call made by Appellant's girlfriend, Debra Miller, reporting a physical domestic incident between her and Appellant at 1615 17th Avenue in Altoona. Affidavit of Probable Cause, 3/21/19.  When the officers knocked on the door, it momentarily opened and then slammed shut.  *Id.*  Ms. Miller then came to the door and opened it.  N.T., 2/3/20, at 39.  Because Appellant could be heard yelling inside the residence, the officers entered.  Affidavit of Probable

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 5101 and 5503(a)(1).

Cause, 3/21/19. Once inside, the officers observed Appellant holding a baby carrier with a small child inside. *Id.*

Other than providing his name, Appellant refused to speak to the officers about the situation. *Id.* Appellant walked from the front door through the living room, where Ms. Miller was, and into the kitchen, while carrying the child. *Id.* Appellant "refused multiple times to put the child down and speak with officers." *Id.* Appellant attempted to leave the residence with the child through the back door, but was met and turned back by additional officers. *Id.* Appellant "took an aggressive stance and clenched his fists multiple times towards [the] officers as [they] attempted to speak with him." *Id.* He "was irate and yelling the entire time officers were attempting to speak with him and would provide no information[.]" *Id.*

Appellant then walked upstairs to the second story of the residence with the child, and returned to the first floor where he finally set the child down in the kitchen. *Id.* Appellant proceeded to the living room where he began yelling at Ms. Miller, and after refusing to communicate and cooperate with the officers, was ultimately detained. *Id.* On March 21, 2019, the Commonwealth charged Appellant with obstructing administration of law, disorderly conduct, harassment, and five counts of resisting arrest.[2]

Appellant appeared for a jury trial on February 3, 2020. The jury convicted Appellant of obstructing administration of law and disorderly

---

[2] 18 Pa.C.S.A. §§ 2709(a)(1) and 5104.

conduct, and acquitted him of resisting arrest. The trial court found Appellant guilty of summary harassment. On February 25, 2020, the trial court sentenced Appellant to 1½ years of probation. Appellant did not file any post-sentence motions. On March 10, 2020, Appellant filed this appeal. The trial court and Appellant have complied with Pennsylvania Rule of Appellate Procedure 1925(b).

On appeal, Appellant presents a single issue for review:

Whether there was sufficient evidence to support a conviction for obstruction of justice where [Appellant] screamed, yelled, and walked around his home but did not interfere with police questioning his girlfriend about a domestic violence incident?

Appellant's Brief at 5.[3]

Although Appellant uses the word "justice" above, he challenges the sufficiency of the evidence supporting his conviction for obstructing administration of law. Appellant's Brief at 8-9. We begin our analysis with our standard of review:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that

---

[3] Appellant raised an additional evidentiary claim in his concise statement. *See* Rule 1925(b) Statement, 3/24/20. However, because Appellant abandoned this claim in his brief, we do not address it. *See* Appellant's Brief at 5; *see also Commonwealth v. Briggs*, 12 A.3d 291, 310 n.19 (Pa. 2011), *cert. denied*, 132 S.Ct. 267 (2011) (refusing to address claim appellant raised with trial court but subsequently abandoned in brief).

of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Leaner*, 202 A.3d 749, 768 (Pa. Super. 2019) (citation omitted). To reiterate, the jury, as the trier of fact — while passing on the credibility of the witnesses and the weight of the evidence — is free to believe all, part, or none of the evidence. *Commonwealth v. Melvin*, 103 A.3d 1, 39 (Pa. Super. 2014) (citation omitted). In conducting review, the appellate court may not weigh the evidence and substitute its judgment for the fact-finder. *Id.* at 39-40.

A person commits a second-degree misdemeanor of obstructing administration of law,

. . . if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act, except that this section does not apply to flight by a person charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.

18 Pa.C.S.A. § 5101.

- 4 -

We have explained:

Evidence that one has physically impeded a law enforcement officer from administering the law has been held sufficient to sustain a conviction under § 5101. *See Commonwealth v. Conception*, [] 657 A.2d 1298 ([Pa. Super.] 1995) (appellant blocked door of her apartment to prevent the police from entering to apprehend fugitive who was hiding in the shower stall); *Commonwealth v. Reed*, 851 A.2d 958, 963-64 (Pa. Super. 2004) (defendant attempted to obstruct the pathway of a uniformed police officer in the common area of an apartment house after the officer exclaimed to the defendant: "Just let me get by and do my job"); *Commonwealth v. Love*, 896 A.2d 1276, 1284-[85] (Pa. Super. 2006) (defendant, in an attempt to interfere with the law enforcement officer who was escorting his wife from the courtroom, placed his arm across the court officer's chest and attempted to push him).

The interference need not involve physical contact with the government official as he performs his duties. *Commonwealth v. Scarpone*, [] 634 A.2d 1109, 1113 ([Pa. Super.] 1993). *See also Commonwealth v. Mastrangelo*, [] 414 A.2d 54 ([Pa. Super.] 1980)[] (upholding a § 5101 conviction based on the defendant's verbal abuse of a parking enforcement officer upon receiving a parking ticket, which then deterred the officer from subsequently performing the job).

*Commonwealth v. Johnson*, 100 A.3d 207, 215 (Pa. Super. 2014).

Appellant claims he "did not deter the police from their investigation and there is no evidence his screaming and yelling was intended to interfere with the investigation." Appellant's Brief at 9. He states:

[Appellant] lost his temper and paced around his apartment screaming and yelling. He did not physically interfere with police officers who were there investigating an alleged domestic incident between [Appellant] and his girlfriend. There is no evidence that [Appellant] intended to interfere with the investigation. The officers were able to conduct their investigation. Therefore, there was not sufficient evidence to sustain a conviction for obstruction of the administration of law.

- 5 -

*Id.* at 7.

In response, the Commonwealth,

. . . submits that there was sufficient evidence presented during the course of the jury trial to support a conviction for Obstructing Administration of Law or Other Government Function. The Appellant was impeding several officers from conducting an investigation into the underlying facts of the physical disturbance by refusing to follow commands and causing a safety risk to all of the involved parties. The Appellant was sweating profusely and walking aggressively throughout the residence from one floor to another while the officers were trying to ascertain more information regarding the reason for their appearance at the residence. At one point, the Appellant took a posturing stance as though he was going to become physical with the officers. During the entire encounter, the Appellant was screaming and was at times incoherent.

The officers were attempting to conduct an investigation concerning a physical disturbance that the victim, who was also the 911 caller, had summoned assistance to the residence for. The Appellant would not allow officers to have a conversation with the victim so that they could ascertain the details necessary to make an informed decision as to how to proceed in their investigation. The Appellant, by screaming obscenities, refusing to listen and obey officer commands and taking a posturing stance, was actively interfering with the officers' ability to engage in the proper steps necessary for their investigation. The [Commonwealth] understands that the Appellant may have been upset at the victim. However, his lack of compliance during the entire seven [] minutes that occurred prior to the officers finally having to use physical force to apprehend the Appellant and place him in handcuffs constitutes obstruction of the lawful duty and authority the officers had to acquire information during the course of their investigation.

Commonwealth Brief at 17-18.

Upon review, we agree with the Commonwealth. However, we first note

that to preserve a challenge to the sufficiency of the evidence, an appellant's

Rule 1925(b) statement must specify the element or elements of a crime alleged to be insufficiently proven. *Commonwealth v. Brown*, 186 A.3d 985, 990 (Pa. Super. 2018) (citing *Commonwealth v. Gibbs*, 981 A.2d 274, 281 (Pa. Super. 2009)). Here, Appellant failed to specify in his Rule 1925(b) statement which element(s) of his obstructing administration of law conviction he is challenging. *See* Appellant's Concise Statement, 3/24/20. Also, Appellant's sufficiency argument is underdeveloped, insofar as Appellant reargues the evidence presented at trial to assert that he "did not deter the police from their investigation." *See* Appellant's Brief at 9. Consistent with the foregoing, we could find waiver. However, we decline to do so, and upon review of the record, we conclude the evidence was sufficient to support the jury's guilty verdict.

Four witnesses, all called by the Commonwealth, testified at trial. Appellant did not present any witnesses.

Blair County 911 Dispatcher Cynthia Emlet testified she received a 911 call at approximately 5:18 a.m. on February 16, 2019 from Appellant's girlfriend, Debra Miller, "because she was having a domestic with her boyfriend or significant other and supposedly he assaulted her and she also told me she assaulted him back and he was trying to leave with their baby." N.T., 2/3/20, at 26-27. Although Ms. Miller was a hostile witness, she confirmed that she made the 911 call. *Id.* at 31.

Altoona Police Patrolman Garrett Trent testified to being dispatched to 1615 17th Street in response to Ms. Miller's 911 call reporting a "physical domestic." N.T., 2/3/20, at 37. Patrolman Trent knocked on the door, which briefly opened an inch or two, then slammed shut. *Id.* at 39. A short time later, Ms. Miller answered the door and allowed him and other officers to enter. *Id.* at 39-40.

Once inside, Patrolman Trent encountered Appellant, who came "storming out from the back of the residence and he's carrying an infant baby seat and there's a small child in it and he is screaming and yelling, doesn't have a shirt on." *Id.* at 41. Patrolman Trent testified: "I've been to thousands of domestic calls, this is something that we routinely answer and in the five years now that I've been working, I've never -- still to this date have not dealt with anyone as irate or out-of-control as [Appellant]." *Id.* at 41-42. He continued:

> So, right away, I mean, our protocol whenever we get to domestic calls is we separate the two parties, whoever they are, and we interview them separately because obviously one person can influence another person's story. In this instance, he's just screaming, yelling, we can't talk to him. We can't talk to the female. We can't talk to anyone. We're getting little bits and pieces as to what happened. . . .
>
> [W]e wanted him to put the child down. . . . [S]o, the thought was we need to get him to put this child down so that we could separate him from the child so that we could talk to him because obviously the thought is the way he's swinging the baby carriage around with this infant, the child is going to get hurt in some way, shape, or form especially if the need arises where he goes after the female that we're there to speak with him about and our primary concern is to make sure that that child is safe. . . .

- 8 -

I know at one point he actually tries to leave the house with the child in his hand. There were other officers fortunately at the backdoor that were able to get him to stay in the house, because, again, it's freezing outside and the child wasn't dressed for the weather, it was in a bucket seat. [Appellant] wasn't wearing appropriate clothing either. At this time, we're suspecting that he's under the influence of something. So, all in all, it wasn't a safe situation. . . .

I would say we gave him -- the leeway that we gave him was probably more than I've ever done with anyone else, specifically, because of his proximity to this child, his proximity to [Ms. Miller], his size, his irate state. Again, as police we don't want to go hands-on with someone. We only do it as a last resort and our primary objective is always just to talk to someone and we talked to him and we talked to him and we talked to him and we gave him order after order after order to put the child down, stop walking around the house, stop doing this and he just refused to listen the entire time. . . .

[H]e actually even went up to a second story of the residence which officers -- again, on typical domestic calls, if we're going to be inside a residence for a while, we conduct what's called a proximity sweep. We just make sure that there's no one else in the house or nothing else in the house, like, there's not a bomb sitting upstairs or someone up there with a gun sitting in a room that's going to ambush us while we're standing there. Typically, that's what we would do. Due to his behavior, we weren't able to conduct our investigation.

*Id.* at 42-45.

Patrolman Trent further testified that Appellant was ultimately detained "because of his threatening nature to the entire household and our inability to conduct an investigation into the domestic incident that we were originally called there for." N.T., 2/3/20, at 56. He stated, "We were unable to interview witnesses, interview the female half of it because of his actions, the way he was storming around the house because it wasn't safe to let him walk around."

*Id.* When questioned by defense counsel as to how Appellant "physically interfere[d] with officers talking to [Ms. Miller]," he stated that Appellant "physically moving around the residence and not listening to commands [was] the obstruction" to their investigation. *Id.* at 56-57.

Altoona Police Corporal Derek Swope also testified to responding to the incident. He stated that when responding to a domestic call, "the first objective is to control the scene and make sure the scene is safe." N.T., 2/3/20, at 62. "So, that include[s] controlling people's movements, whether you're the 911 caller or the alleged suspect of the incident. Controlling their movements, possibly patting them down for weapons and being able to safely conduct a thorough investigation which includes interviews and things of that nature." *Id.* Corporal Swope explained:

> I'm not saying that failure to comply with commands is unlawful force but refusing to stop, moving back and forth, moving freely through a residence when officers are telling you to stop is impeding the investigation. . . .
>
> . . . [Appellant] was given numerous commands to stop, put the child down, moving freely throughout the house, based on my training -- domestic violence situations are some of the most dangerous situations we can respond to. I'm not saying [Appellant] had weapons but in hindsight, we didn't know if he had weapons or not. We didn't know if he -- we don't know if he has weapons stashed somewhere that he may have access to. He was walking around the kitchen, he could've easily grabbed a kitchen knife and turned or escalated the situation drastically. So, that's why we have to control people's movements when we're there to investigate. And, again, it's not just for our safety, it's for [the] safety of everybody involved, you know, I would've been quite content if I could've just had a cordial conversation with [Appellant] and sent him to his mother's house that night but that's not the way he decided to handle this matter. So, we had

to react to what he was doing, and, again, yes, he did physically impede our ability to conduct that safe investigation. . . .

I've handled thousands upon thousands upon thousands of domestic violence situations and it didn't have to end that way and it didn't have to go the way it did but, again, he chose to not listen to what officers were asking of him and that physically prevented us from conducting our investigation.

*Id.* at 73-76.

The above testimony, viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient for the jury to find that Appellant intentionally interfered with and impeded the officers' investigation of the 911 call. *Leaner*, 202 A.3d at 768; *Melvin*, 103 A.3d at 39. Thus, we discern no error in Appellant's conviction of obstructing administration of law. *Johnson*, 100 A.3d at 215 (evidence of interference with a law enforcement officer's administration of the law, which need not involve physical contact with the officer, is sufficient to sustain a conviction under 18 Pa.C.S.A. § 5101).

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/24/2021

- 11 -