J-S41042-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA     :     IN THE SUPERIOR COURT OF
                                           :                PENNSYLVANIA
                                           :
                  v.                       :
                                           :
KENNETH WAYNE DEAVERS          :
                                           :
             Appellant           :      No. 796 MDA 2022

Appeal from the Judgment of Sentence Entered May 16, 2022
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0002508-2018

BEFORE:   LAZARUS, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:         **FILED JANUARY 06, 2023**

Appellant, Kenneth Wayne Deavers, appeals from the judgment of sentence entered in the Court of Common Pleas of Dauphin County after he was retried before a jury on the charge of resisting arrest[1] and found guilty.[2] Herein, Appellant raises several challenges to the sufficiency of the evidence offered to prove the charge of resisting arrest. After careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 5104.

[2] Appellant was retried before a jury on the charge of resisting arrest pursuant to this Court's decision in **Commonwealth v. Deavers**, 236 A.3d 1118 (Table) (Pa. Super. 2020) (unpublished), which overturned Appellant's non-jury trial conviction for failure of disorderly persons to disperse upon official order, 18 Pa.C.S. § 5502, vacated judgment of sentence, and remanded for a new trial on the charges of resisting arrest, *supra*, public drunkenness, 18 Pa.C.S. § 5505, and disorderly conduct, 18 Pa.C.S. § 5503(a)(4). After the jury returned its verdict of guilty, the trial judge found Appellant guilty on the summary offenses of disorderly conduct and public drunkenness.

The relevant facts occurred shortly after 2 a.m. on Thursday, November 23, 2017, Thanksgiving morning, when one of downtown Harrisburg's traditionally busiest bar nights of the year was drawing to a close. As the "closing time" crowd of predominantly young adults exited five neighboring bars on 2nd Street, the sidewalks became so congested that pedestrians with nowhere else to walk began to spill onto the street.

In anticipation of related traffic and safety issues, at least ten law enforcement officers and agents from the Harrisburg City Police Department and the Bureau of Alcohol, Firearms, and Tobacco were already present and assigned the duty of preventing disturbances while safely directing foot traffic to clear the area. Among the first official decisions made at the scene was to "shut down the street" with respect to vehicular traffic until the police "could get the people safely and effectively moved out of the downtown area." N.T. at 25.

Officer Anthony Fiore, who was in full uniform, was directing pedestrians walking in the street to return to the sidewalks and continue walking in a safe manner to their vehicles or homes without interruption. N.T. at 24. At Appellant's jury trial, the officer described the importance of maintaining a calm and steady mass departure under the circumstances that were present that night. Specifically, he explained that he has "experienced everything downtown during the bar-close hours from fights, arguments, stabbings, shootings . . . been present for a homicide, the whole gamut," and he

confirmed that the risk of violence is enhanced when the police are vastly outnumbered as was the case on the night in question. N.T. at 22-23. He amplified:

When [pedestrians] start blocking sidewalks or streets, it starts creating a hazard, not only for the police, because you're . . . kind of losing control of where people can move, foot traffic, other people walking down the street trying to get through, emergency vehicles, it can quickly escalate into a situation where you have no control.

N.T. at 24.

The police-citizen encounter in question occurred while Officer Fiore was repeatedly announcing verbal instructions, accompanied by arm motions, to pedestrians. N.T. at 26. It was at this time he noticed that Appellant, who was walking southbound, had stopped and returned "a blank stare" in response to his instructions. N.T at 27. The officer therefore repeated the instructions and arm motions thinking, perhaps, that Appellant had not heard him. *Id*. Appellant, however, simply continued to stare at him. *Id*.

The third time Officer Fiore repeated himself, Appellant remained in place and replied, "You don't have to play the fucking violin for me, bro," making an apparent reference to the officer's arm motions. *Id*. At that moment, the officer assessed Appellant's noncompliant actions, words, and demeanor and decided it would be imprudent to allow him to join a developing logjam of pedestrians to the immediate south, where yet another bar—

Sawyer's--was letting out its large group of patrons. N.T. at 27-28. He explained:

> I said[, "] alright, you gotta go[,"] and I pointed north. The reason I pointed north is because I was north of the crowd that was coming out of the Sawyer's Bar and I didn't feel that it would be prudent at that point to allow people to keep walking into the crowd, **especially somebody who is not listening to me from the get-go.**

N.T. at 28 (emphasis added).

From that moment, the officer testified, the encounter was brief. Appellant made a comment about needing to continue south to reach his car, but the officer, in his own terms, "stood [his] ground" on not allowing Appellant to become part of the crowd, given Appellant's behavior and refusal to follow instructions. According to the officer's testimony, the following interaction ensued:

> So, he made, not an aggressive step or anything, but he made a motion to start coming back south, and I put my hand out and I took a couple steps north [towards] him and I put my hand on his chest.
>
> After one or two steps back to the north, he made a motion with his other arm, one of his arms where he swatted my hand off his chest.

N.T. at 29.

In what the officer described as a split-second decision arising from concern about Appellant's behavior up to and including the moment Appellant

- 4 -

struck[3] the uniformed police officer's arm, he grabbed ahold of Appellant's jacket and took Appellant to the ground to effectuate an arrest.[4,5] The

---

[3] When asked to demonstrate to the jury the motion that Appellant made as the officer put his hand out, the officer testified, "as my hand is on his chest, he made the motion to remove my hand from his chest. So, he struck the top of my arm with one of his arms." N.T. at 29. He confirmed, in response to follow-up questioning, that Appellant had made a "swiping motion, like [the officer] just demonstrate[d] today. . . ." N.T. at 30

[4] Although our probable cause to arrest inquiry focuses on whether sufficient circumstances, objectively viewed, existed to support the arrest, *see* infra, we note that Officer Fiore described the subjective reasons behind his decision to arrest Appellant, whom he deemed a threat:

> [I]t's going back to square one, refusing the orders to leave the street; the verbal queues [sic] that he gave me in his comment; and then when you start putting your hands on a police officer, a reasonable person would not do that.

N.T. at 30.

[5] Special Agent Jarrod Chittum of the Bureau of Alcohol, Tobacco, and Firearms was partnered with Officer Fiore and assisting with crowd control nearby when he heard Appellant's comment to Officer Fiore. He watched Appellant walk toward Officer Fiore and "strike down Fiore's hand, knocking it out of the way," after Fiore had placed his hand to stop Appellant. When Officer Fiore grabbed ahold of Appellant and both went to the ground, Chittum intervened. N.T. at 60.

Chittum initially denied defense counsel's suggestion that Appellant had swatted Fiore's arm away because officer Fiore was pushing him backwards. "No, I don't think there was any pushing at all. My observation would be, like, just stop, like, as he was walking towards him. It wasn't like a forceful push at all." In the same moment, however, he expressed some doubt and offered that "there may have been" a push, but I do not believe that there was a solid – or a forceful push." N.T. at 65.

Commonwealth showed what it termed a "blurry video"[6] of this encounter. When the officer resumed his testimony after completion of the video presentation, he detailed Appellant's conduct after the two went to the ground.

**Officer Fiore**: Like I said, he rolled to his back. I kind of rolled off as I hit the ground, and then he went into like a defensive mode. Like I said, he pulled his legs up into his chest, tucked his arms, so myself and several other officers in an attempt to get him detained and in handcuffs, we were trying to roll him over, but in doing so getting his arms out from underneath his body became a significant struggle.

**Prosecutor**: And as he's on the ground struggling, are you giving verbal instructions to him?

**A**: Correct. Stop resisting, give me your hands. There's multiple officers giving the instructions.

**Q**: So do you know how many officers were assisting you?

**A**: Probably three or four physically interacting with Mr. Deavers and then several others were standing, because obviously there's a lot of people there. They are standing to make sure that nobody interacts with what we are doing.

---

[6] The Commonwealth acknowledged it was "going to play a video. It's a blurry video, but we are going to try to play it here." N.T. at 31. After the court recessed, and outside the presence of the jury, the trial court acknowledged to counsel the "poor quality of the video and how far away it was from [the subjects]", and it doubted the jury could have evaluated it. The trial court, therefore, agreed that a replay with a zoom feature employed might prove helpful. The jury viewed the zoomed version, after which the trial court addressed the jury regarding the quality of the video, saying, "I know it was difficult to see and it is blurry and hopefully you'll get enough view of it that you'll be satisfied you've seen it all." N.T. at 56-58. The zoomed version then was played a second time.

**Q:** So did the call ever go over the radio that you were engaged in a struggle and other officers showed up at that point?

**A:** Yes. Another – I didn't make the call as I was engaged with Mr. Deavers, but someone did, another officer.

**Q:** So were finally able to subdue Mr. Deavers?

**A:** We were, after the struggle, yes.

**Q:** And you said three to four officers?

**A:** Correct.

**Q:**

. . .

I learned after the fact that one of the officers did attempt to use the Taser.

. . .

**Q:** As you are interacting with him after that, after he's in custody, I'm assuming you are in fairly close range with him?

**A:** Yes.

**Q:** Did he display any signs of intoxication at that point?

**A:** To me he did, yes.

**Q:** What were some of those signs?

**A:** His eyes; his verbal defiance; his reluctance to listen to general commands or instruction from uniform[ed] police; the odor of alcohol from his person, breath, body.

N.T. 34-35, 37.

At the conclusion of trial, the jury returned a guilty verdict on the charges of resisting arrest, while the trial court found Appellant guilty of the summary offenses of public drunkenness and disorderly conduct. Sentencing immediately followed trial, as Appellant had previously served 24 months'

probation and paid fines on the convictions from his first trial, and no further sentence was imposed. Appellant filed a timely notice of appeal on May 25, 2022, and the trial court ordered him to file a concise statement of matters complained of on appeal.

Appellant raises the following issues on appeal:

1. Whether the evidence was insufficient to prove the arrest of Mr. Deavers was lawful, when the officer's rationale for arresting Mr. Deavers was for an offense [failure to disperse] vacated in **Commonwealth v. Deavers**, 236 A.3d 1118 (Table) (Pa. Super. 2020) (unpublished), thus rendering the arrest unlawful?

2. Was there insufficient evidence to show that, at the time Officer Fiore Touched Mr. Deavers he was engaged in an official activity which required acquiescence by Mr. Deavers?

3. Was there insufficient evidence that Mr. Deavers acted to create a substantial risk of bodily injury to officers or employed sufficient force to overcome, when his conduct was the result of Officer Fiore's aggressive behavior towards him due to Mr. Deaver's not submitting to his authority.

Brief for Appellant, at 5.[7]

_____

[7] Appellant appropriately concedes in his argument that if the Commonwealth proved a law enforcement officer was effecting a lawful arrest at the time a defendant was resisting as defined under the resisting arrest statute, then the Commonwealth was not required also to prove the defendant intended to prevent the officer from discharging any other duty, as such elements are stated in the alternative. Therefore, as we determine, *infra*, that Appellant resisted Officer Fiore's attempt to effect a lawful, initial arrest, we need not address whether Officer Fiore was also discharging any other duty at the time.

With respect to challenges to the sufficiency of the evidence, this Court has stated:

> [O]ur standard of review of sufficiency claims requires that we evaluate the record "in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." "Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt."

*Commonwealth v. Rahman*, 75 A.3d 497, 500 (Pa. Super. 2013) (citations omitted).

Resisting Arrest is defined as follows:

> A person commits a misdemeanor of the second degree if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance.

18 Pa.C.S. § 5104.

In Appellant's first sufficiency challenge to his conviction for resisting arrest, he maintains the Commonwealth failed to prove police were effecting a lawful arrest at the time he resisted. Because Officer Fiore's subjective reason for arresting him was invalidated by this Court on direct appeal,[8] Appellant now argues that the Commonwealth could not have produced evidence to establish that the officer acted on probable cause to initiate an

---

[8] In **Deavers**, *supra*, this Court held Appellant had not violated the failure to disperse statute because evidence failed to show he was part of a group of three or more persons disregarding police orders to disperse.

arrest. We disagree, as the Commonwealth introduced sufficient facts at Appellant's criminal trial to prove that the facts and circumstances known to Officer Fiore at the time he initiated the arrest in question supplied him with probable cause to arrest Appellant for disorderly conduct.

"[A] lawful arrest is an element of the crime of resisting arrest," and "the lawfulness of an arrest depends on the existence of probable cause to arrest the defendant." **Rahman**, 75 A.3d at 504 (citations omitted). "Probable cause to arrest exists when the facts and circumstances within the police officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." **Commonwealth v. Weaver**, 76 A.3d 562, 565 (Pa. Super. 2013) (citations omitted). **See Commonwealth v. Clark**, 735 A.2d 1248, 1252 (Pa. 1999) (holding probable cause must be viewed not from the perspective of the offender, but from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of the arrest guided by his experience and training).

Whether probable cause exists at the time a police officer stops someone or conducts a search "is predominately an objective inquiry." **Ashcroft v. al-Kidd**, 563 U.S. 731, 736 (2011) (quotations and citations omitted). "[T]he question that we ask is not whether the officer's belief was correct or more likely true than false; rather, we require only a probability, and not a *prima*

- 10 -

*facie* showing, of criminal activity." ***Commonwealth v. Miller***, No. 393 MDA 2019, 2020 WL 754858 (Pa. Super. filed Feb. 14, 2020) (unpublished), *appeal denied*, 239 A.3d 1090 (Pa. 2020), (citing ***Commonwealth v. Williams, R.***, 2 A.3d 611, 616 (Pa. Super. 2010)). ***Cf Commonwealth v. Stokes***, 266 A.3d 621 (Pa. Super. Oct. 8, 2021) (unpublished) (recognizing an officer's mistake of law relied upon in carrying out a constitutional search or seizure may nevertheless be reasonable if supported by specific facts supporting the search or seizure).[9]

According to Officer Fiore, the encounter in question occurred amid precarious circumstances—namely, the late hour and the largest crowd of bargoers of the year exiting simultaneously onto 2nd Street—and he knew from his extensive law enforcement experience in that location that a steady and orderly mass exit of such a pedestrian crowd was imperative to maintaining public safety. Most people were complying, but Appellant elected to stop and stare at the officer in deliberate disregard of the officer's repeated directives to keep walking, and he used vulgar sarcasm to mock the officer's efforts to aid the public.

Both concerned by this behavior and informed by his experience with closing time fights and clashes on 2nd Street, Officer Fiore determined that

---

[9] Under Pennsylvania Rule of Appellate Procedure 126(b), nonprecedential decisions (referring to unpublished memorandum decisions of the Superior Court) filed after May 1, 2019, may be cited for their persuasive value.

Appellant should be kept apart from the gathering, stationary crowd outside of Sawyer's bar just to his south to minimize the potential for conflict. Therefore, he directed Appellant to exit the location by walking northbound.

Appellant, however, ignored the officer's directive and resumed his southbound course. When Officer Fiore placed his hand on Appellant's chest to block Appellant's defiant advance, Appellant struck the officer's arm in an effort to continue on his way. It was then that the officer decided to arrest Appellant for disobeying multiple orders to leave the area.

The facts and circumstances of Appellant's repeated noncompliance with public safety directives coupled with his forceful removal of an officer's hand to override such directives were known by Officer Fiore at the time of their commission, and they were sufficient to warrant an officer in Officer Fiore's position, exercising reasonable caution, to believe Appellant had committed the arrestable offense of disorderly conduct as defined at 18 Pa.C.S. § 5503(a)(4).[10]

---

[10] The crime of disorderly conduct proscribed in Subsection 5503(a)(4) is defined as follows: "[a] person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, **or recklessly creating a risk thereof, he . . . creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor**." 18 Pa.C.S.A. § 5503(a)(4) (emphasis added). With respect to grading, "[a]n offense under this section is a misdemeanor of the third degree if the intent of the actor is to cause substantial harm or serious inconvenience, or if he persists in disorderly conduct after reasonable warning or request to desist. Otherwise, disorderly conduct is a summary offense." *Id*. at § 5503(b) emphasis added.

In reaching this conclusion, we find a recent three-judge, unpublished panel decision of this Court instructive. In **Miller**, **supra**, the defendant Miller challenged the suppression court's order denying his motion to suppress evidence obtained after he was arrested for disorderly conduct pursuant to Section 5503(a)(4).

Specifically, the suppression court rejected Miller's argument that police lacked probable cause to arrest him for repeatedly defying orders that he leave the scene of an area the police were trying to secure. The record established that police officers were "in the process of deescalating a chaotic and hostile environment, and restoring public order by apprehending the individuals engaged in multiple fights, and dispersing a crowd of thirty to seventy individuals." **Id**. at *6.

In affirming the suppression court's determination that probable cause existed to arrest Miller for disorderly conduct, we reasoned:

> Miller, who was visibly intoxicated, continuously ignored police directives to leave the convenience store parking lot that police were attempting to secure, and instead kept trying to reenter that specific area. The officers did not need to establish that Miller intentionally created a hazardous condition. Rather, they merely needed to believe that his intoxication and refusal to comply with multiple police directives to leave the area established a probability that his continued presence created a hazardous condition to himself, the officers, and the public. **See Commonwealth v. Williams, R.**, 2 A.3d at 616 (holding that for probable cause we require only a probability, and not a *prima facie* showing, of criminal activity).

**Miller**, at *6.

On the question of whether Officer Fiore similarly possessed probable cause to believe Appellant had recklessly created a hazardous condition to himself, the officers, and the public, we find the present facts compare favorably to those in *Miller*. Here, though at the time of the arrest Officer Fiore had not yet ascertained that Appellant was intoxicated, he had witnessed circumstances quite similar to those present in *Miller*, as Appellant was displaying odd, scofflaw behavior at a scene where multiple law enforcement officers were attempting to maintain order among a large, overflowing crowd of closing-time pedestrians. Moreover, whereas the defendant's conduct in *Miller* was non-violent, Appellant physically opposed Officer Fiore's final attempt to redirect his movements, as he struck the officer's arm away.

Regarding such physical opposition to an officer's directive, we have observed:

> Inherent in the act of physically attempting to impede a law enforcement officer from carrying out his or her official duties in the public arena is the risk of creating a condition hazardous or physically offensive in nature. We have held, "the reckless creation of a risk of public alarm, annoyance or inconvenience is as criminal as actually causing such sentiments."

*Commonwealth v. Love*, 896 A.2d 1276, 1286 (Pa. Super. 2006) (citation omitted).

Therefore, because Officer Fiore personally knew of and witnessed the facts and circumstances to giving rise to the reasonable belief that Appellant had recklessly created a risk of public inconvenience through acts serving no legitimate purpose of the actor, he had probable cause to arrest Appellant for

disorderly conduct under Subsection 5503(a)(4). Accordingly, we discern no merit to Appellant's claim that the evidence adduced at his criminal trial failed to prove beyond a reasonable doubt that the arrest against which he resisted was a lawful arrest.

In Appellant's final issue, he maintains that even assuming Officer Fiore possessed cause to arrest under the circumstances, the Commonwealth failed to establish that Appellant, with the intent of preventing a lawful arrest, either created a substantial risk of bodily injury to the public servant or employed means justifying or requiring substantial force to overcome the resistance. Instead, Appellant maintains, the evidence demonstrated that he was simply reacting to Officer Fiore's act of taking him to the ground to effect the arrest. We disagree.

Appellant essentially argues that his passive resistance to law enforcement officers' attempts to place him in custody was not culpable under the resisting arrest statute. Our jurisprudence has recognized, however, that such an argument completely ignores the statutory language of section 5104 "criminalizing resistance behavior that requires substantial force to surmount." *Commonwealth v. Thompson*, 922 A.2d 926, 928 (Pa. Super. 2007) (holding arrestee's keeping her arms and legs interlocked with those of her husband, which made officers' attempts to place her under arrest "exhausting," amounted to "substantial force" needed to overcome resistance).

Our review of the record, as reproduced *supra*, shows the Commonwealth proved beyond a reasonable doubt that Appellant employed means justifying or requiring substantial force to overcome the resistance. As observed by the trial court, which presided over Appellant's jury trial, the evidence showed that "it took a struggle of three law enforcement officers and the use of a taser twice to restrain [Appellant.]" [N.T. at] 35, 63, 68-70. The jury could reasonably conclude that [Appellant's] resistance justified or required a substantial effort to overcome. Having so found, this basis can support Appellant's conviction even if the jury did not believe that Appellant presented a substantial risk of bodily injury." Trial Court Opinion, at 7-8.[11]

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/06/2023

---

[11] **See Commonwealth v. Wertelet**, 696 A.2d 206, 211 (Pa. Super. 1997) ("One commits resisting arrest if one employs means justifying or requiring substantial force to overcome the resistance. Examples of "means" which would undoubtedly satisfy the Code by requiring substantial force to overcome would be any kind of significant physical resistance, including punching, shoving, squirming, biting, or kicking.") (internal citations and quotation marks omitted).