J-S02015-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL A. CRIMI | : | |
| | : | |
| Appellant | : | No. 481 MDA 2022 |

Appeal from the Judgment of Sentence Entered December 2, 2021
In the Court of Common Pleas of Columbia County
Criminal Division at No(s): CP-19-CR-0000298-2020

BEFORE: PANELLA, P.J., OLSON, J., and DUBOW, J.

MEMORANDUM BY PANELLA, P.J.: **FILED: MAY 1, 2023**

Michael Crimi appeals the judgment of sentence imposed by the Columbia County Court of Common Pleas after a jury convicted him of third-degree murder and related offenses for beating his then-girlfriend's three-year-old daughter, I.B., to death. Crimi raises seven issues on appeal, including: a challenge to the trial court's granting of one of his requested remedies for the Columbia County Clerk of Courts' ("clerk of courts") inadvertent disclosure of *ex parte* and sealed defense motions to the Columbia County District Attorney's office ("DA"); challenges to the trial court's discretion in declining to conduct individual *voir dire* of potential jurors as well as its discretion in admitting social media posts and testimony by the Commonwealth's forensic pathologist into evidence; a sufficiency and a weight claim; and a discretionary aspect of sentencing claim based in part on the fact

that he was 19 years old when the offenses occurred. As Crimi's issues are either waived or meritless, we affirm.

On November 25, 2017, I.B. was in the care of Crimi, when Crimi called 911 because I.B. was unconscious. I.B. was taken to the hospital and later died from blunt head trauma. The death was ruled a homicide and Crimi was charged with the homicide, along with related offenses. The Commonwealth also filed a notice of its intent to seek the death penalty.

Defense counsel filed several *ex parte* motions related to expert witnesses and investigative services, which were placed under seal. However, the clerk of courts inadvertently disclosed seven of those motions to the DA and posted them on the public docket. Crimi filed a motion to dismiss based on this disclosure, seeking to either have his charges dismissed or the death penalty notice revoked or, in the alternative, have the prosecution of his case transferred to the Pennsylvania Office of the Attorney General ("OAG"). **See** Motion to Dismiss, 8/4/2020, at 7-8 (unpaginated).

The court held a hearing on the motion on September 3, 2020. Following the submission of briefs, the court issued an order and opinion the following month. In the opinion, the court found that the title of the motions revealed defense strategy, and although the disclosure of the *ex parte* motions had been inadvertent, the court agreed that the circumstances mandated the appointment of another prosecutor. **See** Trial Court Opinion, 10/2/2022, at 3, 7. The court transferred prosecution of the case to the OAG.

Crimi filed a motion for reconsideration, which the court denied after holding a hearing on the motion on November 5, 2020. Two months later, on January 12, 2021, the court granted the OAG's motion to withdraw the intention to seek the death penalty.

The court set a trial date. Prior to the start of jury selection, the court announced that because this was no longer a capital case, there would not be individual *voir dire*. Rather, the court would conduct the *voir dire en masse*, and when doing so, would reference the proposed *voir dire* questions submitted by the parties. **See** N.T., 9/24/2021, at 2. The court advised counsel they would be allowed to ask supplemental questions. **See id.** at 5. Jury selection was then conducted and completed on September 30, 2021.

Trial began a few days later, on October 4, 2021. I.B.'s mother, Sierra Brown, testified the following day. She recounted I.B. was born in Pennsylvania in 2014 when Brown was in ninth grade, and that I.B.'s father had never met I.B. **See** N.T., 10/5/2021, at 465-466. Brown stated she moved to Florida, and attended a high school for teenage mothers there. **See id.** at 468, 471. Brown met Crimi while in Florida, and the two began dating in June 2017. **See id.** at 472.

Brown testified she and I.B. moved back to Pennsylvania in August 2017. **See id**. at 474. The two of them moved into their own apartment the following month, in September 2017. **See id.** at 477. Crimi then moved to

Pennsylvania, and in with Brown and I.B., in October 2017. *See id.* at 478-79.

Brown got a job working four days a week from 7 a.m. until 5:30 p.m. *See id.* at 480. Crimi watched I.B. on the days Brown went to work. *See id.* at 480. Brown recalled that she got several texts from Crimi about I.B. while she was in Crimi's care, and the Commonwealth admitted the texts into evidence. Brown read several texts which indicated Crimi's frustration with caring for I.B. For example, Brown testified that on October 25, 2017, Crimi sent a text to Brown while she was at work complaining I.B. "won't stop crying and I'm going to jump off the balcony." *Id.* at 538. He then texted he was "literally about to go insane today." *Id.*

Brown testified she received a text from Crimi a few days later, on October 28, telling her I.B. had fallen in the tub and hit her head. *See id.* at 488. When Brown returned home, she saw I.B. had a bruise around her right eye. *See id.* at 488-489. Brown testified I.B. also had a bruise on her left cheek at this time, which Crimi told Brown I.B. had gotten when she had fallen down the stairs. *See id.* at 492. Then, on October 29, Crimi sent a message to Brown telling her he was angry as he believed I.B. was lying to him. *See id.* at 542.

In early November 2017, Brown testified I.B. began losing her hair and vomiting. Brown eventually took I.B. to the emergency room on November 10, where I.B. had a CT scan of her head. I.B. was ultimately diagnosed with

constipation and discharged, with Brown being advised to make follow-up appointments. *See id.* at 495-498.

Brown testified that I.B.'s vomiting abated but that I.B. became more and more clingy to Brown, and was wetting her bed despite being potty-trained. *See id.* at 494, 497, 499. According to Brown, Crimi would get frustrated with I.B., and Brown had to tell Crimi not to spank I.B. after seeing him use that form of punishment on her. *See id.* at 500.

Brown testified her relationship with Crimi deteriorated between November 10 and November 25, as the two were arguing more and more. *See id.* at 500-501. Brown testified Crimi grew increasingly clingy, *see id.* at 493, and sent her texts professing his love for her while also relaying his insecurity about Brown's feelings for him. *See id.* at 543-554. She recounted that she asked Crimi to move out multiple times, but he refused. *See id.* at 507.

Brown testified she got a call on November 22 from Crimi, who was watching I.B. Crimi told Brown that I.B. had once again fallen and hit her head on the bathtub faucet. *See id.* at 504. I.B. got a bruise around her right eye. *See id.* at 505. The following day was Thanksgiving, which Brown, I.B. and Crimi spent together. Brown testified she again asked Crimi to leave that day, but he did not. *See id.* at 505.

The following evening, November 24, Crimi went to work. While Brown was feeding I.B. dinner, I.B. fell from her booster seat and bumped her head,

leaving a bump on her right temple. *See id.* at 509, 511. According to Brown, the incident did not cause any behavior changes in I.B. and Brown was not concerned I.B. had sustained a concussion. *See id.* at 510. Brown gave I.B. a bath, did not notice any injuries other than around her eye and forehead, and put I.B. to bed. *See id.* at 508, 531-532; N.T., 10/6/2021, at 666-667. Brown went to bed before Crimi got home from work. *See* N.T., 10/5/2021, at 511.

The next morning, November 25, Brown testified she had to go to work and left at around 6:20 in the morning. *See id.* at 512. Before leaving for work, Brown stated she said goodbye to I.B., who was awake in her bed and told Brown goodbye and that she loved her. *See id.* at 512. According to Brown, she noticed I.B. still had the injury on her forehead from the booster-seat fall the night before, *see id.* at 513, but was "alive and well and in good health." *Id.* at 515. Crimi was in the apartment when Brown left for work, and was the person responsible for caring for I.B. that day. *See id.* at 515.

Brown testified she was called to Human Resources at her work after lunch, where she was told to call Crimi. Crimi informed Brown that there was an emergency - I.B. was unresponsive and he had unsuccessfully tried to wake her by putting her in the tub. *See id.* at 517. He told Brown he had called 911. *See id.*

Kristopher Harger, the EMT who responded to the 911 call, also testified at trial. According to Harger, he and his partner received the report of an

unresponsive child around 12:20 p.m. on November 25, and they arrived at the apartment approximately ten minutes later. Crimi was there. Harger tried to ascertain what had happened, and Crimi told Harger about various falls I.B. had recently taken which were not "very descriptive or specific" and "changed quite a few times." N.T. 10/4/2021, at 45, 61-62. Crimi did, at one point, tell Harger he had tried to wake I.B. up at around 11 that morning and put her in the bathtub when he could not rouse her. *See id.* Throughout the encounter, Crimi was, according to Harger, agitated, anxious and jittery. *See id.* at 49, 61, 95, 110.

Harger found I.B. on a mattress, where she was naked and unresponsive. *See id.* at 47. She had blood around her nose and mouth. *See id.* at 69. She also had bruising around her head, including "battle wounds" behind her right ear and her left ear. *Id.* at 47-48. After Harger carried I.B. to the ambulance, he noticed she had additional bruising around her ribs. *See id.* at 69-70. I.B. was taken to Berwick Hospital, although it was decided *en route* that she would be life-flighted to Geisinger Medical Center ("Geisinger"). She was life-flighted to Geisinger that same afternoon.

Dr. Paul Bellino was the inpatient consultant for the child abuse team at Geisinger and he examined I.B. once she arrived at the hospital. Dr. Bellino testified about his findings at trial, after being accepted as an expert in pediatric trauma and abuse. *See* N.T., 10/4/2021, at 209. Dr. Bellino reported that I.B. was intubated and comatose when she arrived at the hospital. *See*

*id.* at 210. She was in critical condition, with what Dr. Bellino described as a very poor prognosis for survival, and was "clearly visibly injured with a number of bruises." *Id.* at 211, 212, 215.

In fact, Dr. Bellino cataloged 40 discreet bruises on I.B. over "pretty much every body surface: Her head, her ears, face, her shoulders, armpits, upper arm, lower arm, legs, even her feet, her buttocks, her back." *Id.* at 219; *see also id.* at 222-231 (referring to photographs submitted as exhibits and describing specific bruises on I.B.'s body in those photographs). Dr. Bellino testified that "the sheer fact that [I.B.] had so many bruises and the location of those bruises gives me an understanding of what happened to her … And when I think about what happened to her as a whole, it becomes obvious that … these bruises are indicative of a severe beating which is ultimately the cause of her death." *Id*. at 232; 284 (reiterating that "I mean, I have no doubt [I.B. was] beaten to death.").

Dr. Bellino also referenced the CT scan of I.B.'s head that had been taken at the hospital. Dr. Bellino reported that the scan showed bleeding in I.B.'s head and swelling of her brain so severe that it was cutting off the flow of blood to the brain. *See id.* at 215-216. It was, according to Dr. Bellino, markedly different from the CT scan that had been performed on I.B. on November 10, which "was perfectly normal." *Id.* at 217. In contrast, I.B.'s CT scan performed on November 25 showed bleeding "basically over both of the upper portions of the skull" and was "very concerning." *Id.* at 217-218.

According to Dr. Bellino, the bleeding around I.B.'s brain was "caused when the brain move[d] inside the skull in a violent fashion." *Id.* at 233.

Dr. Bellino further testified that I.B. had a number of retinal hemorrhages in both eyes, which is "probably one of the most distinguishing features of abusive head trauma." *Id.* at 240. Dr. Bellino concluded that I.B.'s injuries, in his opinion, were not accidentally inflicted but rather were from "severe forceful activity." *Id.* at 240-241. He opined that I.B.'s injuries were so extensive that I.B. would not have had any real function after they were inflicted. *See id.* at 241-242. So, for example, I.B. would not have been able to tell her mother goodbye and that she loved her if the injuries had already been inflicted. *See id.* at 242. In the end, without medical intervention, Dr. Bellino testified he "wouldn't have expected [I.B.] to be able to do anything, let alone live for more than a couple hours, after a beating like that." *Id.* at 281.

Brown testified she was told on November 28 that I.B. had been declared brain dead. *See* N.T., 10/5/2021, at 527. Brown decided to take I.B. off life support that same day, and I.B. died. *See id.* A memorial service was held for I.B., but Crimi did not attend the service because he had returned to Florida with his family. *See id.* at 530.

Crimi testified on his own behalf. He testified he was 19 when he moved in with Brown and I.B. *See* N.T., 10/7/2021, at 951. He agreed that he and Brown argued, but he maintained he wanted the relationship to work. As for

the time around I.B.'s death, Crimi testified he went to work on November 24 and got home around midnight or 12:30 in the morning on November 25. *See id.* at 982-983.

He testified he woke up the morning of November 25 when a truck arrived to deliver a TV to the apartment. *See id.* at 984. I.B. was not yet awake, and after the TV was installed, Crimi stated he went in to wake I.B. up. According to Crimi, I.B. was under a blanket and her eyes were slightly open and only showing the white part of the eye. She was not responsive. Crimi maintained he tried to perform CPR, and when that didn't work, he placed I.B. in the bathtub. *See id.* at 986-987. At some point, Crimi did a search on his phone for "how to wake up a knocked out toddler," with "knocked out," according to Crimi, meaning not waking up. *Id.* at 987. He then tried to call Brown, could not reach her, and called his mother and then 911. *See id.* at 989. Crimi maintained he never hit, kicked, or did anything to cause physical harm to I.B. *See id.* at 1006.

Following the five-day trial, the jury convicted Crimi of third-degree murder, aggravated assault and endangering the welfare of a child ("EWOC"). The court sentenced Crimi to 216 to 444 months' incarceration for the murder conviction, and to a consecutive term of 12 to 36 months of incarceration for the EWOC conviction. Crimi filed post-sentence motions, which the trial court denied.

Crimi filed a timely notice of appeal, and the trial court directed Crimi to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Crimi complied, raising ten issues. The trial court summarily dismissed Crimi's claims as meritless in its three-page Rule 1925(a) opinion. Crimi now raises the following issues for our consideration:

1. Whether the Trial Court erred in not dismissing the case when seven defense *ex parte* motions under seal were provided to the prosecuting district attorney by the clerk of courts.

2. Whether the Trial Court erred in its conduction of jury selection, when individual *voir dire* was requested by both parties and granted by the court and then [the court] did not allow counsel to conduct their own *voir dire* and ask the potential jurors questions.

3. Whether the Trial Court erred in granting evidence of prior bad acts under [Pa.R.Crim.P.] 404(b).

4. Whether the Court erred in allowing hearsay evidence of the Commonwealth's forensic pathologist.

5. Whether the Trial Court erred in denying the motion for acquittal or a new trial based on sufficiency and weight of the evidence and not dismissing first-degree murder on motion for demurrer.

6. Whether the Trial Court erred in not considering [Crimi's] expressed remorse, lack of aggravating circumstances and evidence of mitigating factors when sentencing [Crimi] to consecutive sentences at the high end of the sentencing range.

7. [Whether] [t]he Commonwealth committed prosecutorial misconduct in not providing a picture testified by mother that was taken of the minor child by mother after her fall with mother the evening prior to the alleged injuries.

Appellant's Brief at 5-6.

In his first issue, Crimi essentially claims the trial court abused its discretion by not dismissing his case after it was discovered that the clerk of courts had inadvertently delivered the *ex parte* defense motions to the DA. Crimi does not provide more than a selective and incomplete background explaining his claim, but he does make a series of generalized claims that the Commonwealth's actions violated his rights to due process, equal protection, effective counsel and against self-incrimination, and asserts the DA engaged in misconduct. He claims the remedy for these violations should have been dismissal of all charges, not the transferral of the prosecution of his case. This claim fails.

In making his argument, Crimi fails to acknowledge that one of the remedies he proposed for the clerk of courts' dissemination of the *ex parte* motions was the transfer of the prosecution of the case from the DA's office to the OAG. After a hearing, this is the exact remedy the trial court gave Crimi. The court gave the following background and explanation for the award of the remedy:

> [Seven *ex parte* defense] motions were delivered by the clerk of courts to the [DA]'s office and docketed and identified on the public docket. The titles of the motions [were placed on the outside of the sealed envelope and] identified the subject of each motion. The assistant district attorney [("ADA")] stated that he glanced at the motions and saw their titles. Regarding one motion, he read it and conferred with an out of county district attorney for witness preparation regarding a witness referred to in the motion. The ADA was credible when he testified that it had not occurred to him that he should not have received the motions.

> Subsequently, [Crimi's] counsel discovered that the ADA had been given copies of the motions by the clerk of courts. The ADA removed the motions from the ADA file and returned them to defense counsel.

> ***

> [Crimi] requests dismissal of all the charges based on his defense having been compromised. Such an extreme remedy is not warranted. But the fact[s do] demand a remedy. … The appearance of and the actual denial of due process and the appearance of unfairness to this indigent defendant in this capital case warrants untarnished prosecutorial eyes.

Trial Court Opinion, 10/2/2020, at 2-3, 6-7. The trial court then directed that the prosecution of the case be transferred to the OAG's office, just as Crimi requested.

Crimi's only acknowledgement of this remedy and his only argument regarding its alleged inadequacy in his appellate brief is the following statement:

> The removal of the District Attorney's office only did so much as a protective order was not issued until after the case was transferred and the Commonwealth *via* the District Attorney and Attorney General's Office had already spoken, emailed and met.

Appellant's Brief at 38.

Although Crimi does not explain this assertion further, he appears to contend that the remedy of transferring prosecution to the OAG did not cure any violation of his rights because although prosecution was transferred, there had been communication between the two offices about the case. Again, Crimi does not reference this in his appellate brief, but he did file a motion for reconsideration from the court's decision to transfer prosecution of the case.

At the hearing on that reconsideration motion, Crimi specifically argued the court should either dismiss the charges or bar death as a possible penalty because "[a]pparently, there's been communication [about the *ex parte* motions] between the [ADA] and the [AOG]'s office about the case." N.T., 11/5/2020, at 4. After hearing testimony on the matter, including from the ADA, the court made this specific finding:

> The court finds that no information was released to the Attorney General's Office whatsoever concerning the *ex parte* motions under seal. The [DA]'s office specifically did not reveal such information. The [OAG]'s office is a blank slate on that issue and knows nothing about it, and the Court makes that specific finding based upon the testimony here today.

*Id.* at 31.

Given this specific credibility finding by the court, which Crimi does not even acknowledge, Crimi has not put forth any meritorious argument that the court abused its discretion by transferring prosecution of the case as a remedy for the inadvertent disclosure of the *ex parte* defense motions. This claim warrants no relief.

In his second claim, Crimi argues the trial court abused its discretion by denying his request that *voir dire* of the jury pool be conducted individually, and instead conducting *voir dire en masse*. This claim also fails.

As Crimi explicitly acknowledges, individual *voir dire* is only required in capital cases. *See* Pa.R.Crim.P. 631(F). Although it is true Crimi's case was originally a capital case, the OAG withdrew the intention to seek the death penalty, making Crimi's case a non-capital one. Again, as Crimi recognizes, in

- 14 -

such non-capital cases, the trial court has the discretion to determine who will ask questions of the jurors and whether the jurors will be questioned collectively or individually. *See id.* "[T]he sole purpose of examination of jurors under *voir dire* is to secure a competent, fair, impartial and unprejudiced jury," and, as such, "the inquiry should be strictly confined to disclosing qualifications of a juror and whether the juror has formed a fixed opinion or may be otherwise subject to disqualification for cause." ***Commonwealth v. Ellison***, 902 A.2d 419, 423-424 (Pa. 2006) (citation omitted).

Here, in arguing the trial court abused its discretion, Crimi outlines general law about *voir dire* and then tacks on the following bald assertions:

> The way the questioning was done by the Court resulted in few to no responses of the jury pool. Counsel was not permitted to follow up on questions to the jurors. Counsel was not given a proper or adequate opportunity to question[ ] the jurors to determine the jurors['] qualifications.

Appellant's Brief at 42.

As the Commonwealth points out, Crimi does not elaborate on these assertions or point to the place in the record where any of these alleged issues occurred, as specifically required by our Rules of Appellate Procedure. ***See*** Pa.R.A.P. 2119(c). He does not identify any juror who required follow-up questions where none were given, or provide the additional questions that he asserts counsel was not allowed to ask. He does not identify any seated juror who indicated an inability to be fair and impartial. In the end, Crimi's

undeveloped claims are waived, *see id.*; ***Commonwealth v. Love***, 896 A.2d 1276, 1287 (Pa. Super. 2006) (stating that arguments that are not sufficiently developed are waived), and certainly fail to convince us that the court abused its discretion in the manner in which it conducted *voir dire*. No relief is due on this claim.

In his third allegation of error, Crimi alleges the trial court abused its discretion in allowing evidence of his prior bad acts. He argues the trial court should not have allowed the Commonwealth to introduce evidence of his use of, and attempts to obtain, marijuana or evidence of his social media posts in the weeks leading up to I.B.'s death. This claim is waived, and in any event, lacks merit.

Crimi first generally asserts the trial court erred by allowing evidence of his use of, and inability to obtain, marijuana in the time leading up to I.B.'s death. Crimi, however, once again does not provide this Court with the background relevant to this claim, nor does he identify the specific evidence he is challenging or point to the places in the record where this evidence was referenced. His claim is waived for these reasons. ***See*** Pa.R.A.P. 2119(c); ***Love***, 896 A.2d at 1287. Even if we were to overlook waiver, Crimi has not established his claim warrants relief.

Prior to trial, the Commonwealth sought to introduce evidence of Crimi's "drug use and threats of killing others in the weeks preceding [I.B.]'s death." ***See*** Commonwealth's Response to Defendant's Pretrial Motions, 8/3/21, 4-5

(unpaginated). More specifically as to the drug use, the Commonwealth outlined in its pretrial filings that it planned to introduce evidence of Crimi's Facebook posts indicating his frustration with I.B. and his relationship with Brown, how he needed "to smoke," and that he had been seeking drugs and continued to do so up until the morning of I.B.'s death. **See id.** at 4-5 (unpaginated). The Commonwealth argued this evidence was admissible to show Crimi's state of mind, motive, and the history of the case. **See id.**; N.T., 7/1/2021, at 24. Ultimately, the trial court granted the motion and found evidence of Crimi's drug use was admissible for the limited purpose of showing, *inter alia*, motive and the history of the case. **See** Trial Court Order, 9/3/2021, at 1-2 (unpaginated).

At trial - and again Crimi does not specifically identify the challenged evidence or reference its place in the record - the Commonwealth did present evidence of several of Crimi's Facebook posts indicating Crimi was frustrated and "in pain", and that Crimi wanted or needed "to smoke." **See** N.T., 10/6/2021, at 691-717 (Special Agent David Scicchitano reading Facebook posts from Crimi's Facebook account). There was one Facebook post from November 16, 2017 where Crimi stated I.B. had "just pooped on me and I need to smoke." **See id.** at 700. The posts also generally relayed Crimi's attempts to obtain drugs, up to and including on November 25, 2017. **See id.** at 691-717.

Crimi acknowledges the Commonwealth used this evidence of his drug use to support its argument that Crimi sought marijuana as a coping mechanism for his increasing frustration with his childcare responsibilities. *See* Appellant's Brief at 47-48. Crimi argues, however, the trial court should not have allowed the Commonwealth to introduce the evidence because it is irrelevant and unduly prejudicial.

We review a trial court's ruling on the admission of evidence for an abuse of discretion. *See Commonwealth v. Urrutia,* 653 A.2d 706, 709 (Pa. Super. 1995). Generally, the threshold question with the admission of evidence is whether the evidence is relevant. *See Commonwealth v. DiStefano*, 236 A.3d 93, 98 (Pa. Super. 2020). Pursuant to our Rules of Evidence, evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and that fact is of consequence in determining the action. *See id*.; Pa.R.E. 401. Even if evidence is relevant, however, the court can still exclude the evidence if it concludes that the probative value of the evidence is outweighed by, among other things, a danger of unfair prejudice. *See* Pa.R.E. 403.

When evidence involves "a crime, wrong, or other act[,]" it is inadmissible to prove a person's character in order to show that the person acted in accordance with that character. Pa.R.E. 404(b)(1). Such evidence may be admissible, however, when relevant for another purpose such as proving motive or lack of accident or establishing the history of the case. *See*

Pa.R.E. 404(b)(2); ***Commonwealth v. Lark,*** 543 A.2d 491, 497 (Pa. 1988). It is only admissible for such a purpose in criminal cases, though, when the trial court determines that the probative value of the evidence outweighs its potential for unfair prejudice. ***See id***. In this context, unfair prejudice means a "tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403 *cmt*.

Here, the trial court found that the evidence of Crimi's drug use was relevant to establishing motive and the history of the case, was not unduly prejudicial, and was therefore admissible. In support of his argument that the trial court abused its discretion in reaching this conclusion, Crimi argues the evidence should not have been admissible as the Commonwealth failed to establish a timeline or nexus connecting his marijuana use and I.B.'s death and there was no evidence that he killed I.B. solely because he could not obtain drugs. The Commonwealth responds:

> First, the Commonwealth did establish a timeline for when [Crimi] posted about wanting to obtain drugs or "smoke," because the posts were dated. Those dates demonstrated that the posts were created within the weeks prior to I.B.'s death, and they were usually accompanied by expressions of frustration either with I.B. or his relationship with [ ] Brown.
>
> Second, the Commonwealth never contended that [Crimi] killed I.B. because he couldn't obtain drugs … [T]he posts about needing to get drugs and/or to smoke were part of a larger narrative showing [Crimi's] downward spiral [and increasing frustration with I.B. and Brown] in the weeks leading to I.B.'s death.

Commonwealth's Brief at 38-39.

We agree with the Commonwealth that Crimi's arguments that the trial court abused its discretion in allowing the evidence referencing his drug use are unconvincing. Therefore, even if the issue were deemed not to be waived, Crimi has failed to establish the trial court abused its discretion, and his claims to the contrary merit no relief.

In the latter part of his third issue, Crimi also condemns the Commonwealth's use of his social media posts referencing murder and his desire to kill something. He does not identify any of those posts, except one where "when allegedly attempting to obtain marijuana, [Crimi] stated, '[B]y the way I really appreciate I been wanting to kill people lately ha ha.'" Appellant's Brief at 51. He summarily claims these posts were inadmissible because they were not directed toward anyone individually, in particular toward I.B. However, as the Commonwealth explains, these posts helped explain Crimi's increasing frustration with his situation and relationship with Brown, and were probative as evidence of Crimi's motive, not as evidence that he actually threatened I.B. In short, Crimi's undeveloped claim does not establish an abuse of discretion on the part of the trial court, and it does not warrant relief.

In his fourth claim, Crimi asserts the trial court abused its discretion by allowing hearsay evidence of the Commonwealth's forensic pathologist. Again, without cogently explaining his claim, Crimi argues he was denied his right to

confront the "medical examiner" because the medical examiner did not testify and he therefore could not cross-examine her about her opinions in the autopsy report. We agree with the Commonwealth that this claim was not properly preserved and is therefore waived.

As the Commonwealth explains, and the record reflects, the forensic pathologist who had performed the autopsy and completed the autopsy report, Dr. Barbara Bollinger, was no longer with the forensic pathology practice by the time Crimi's trial began. Therefore, another forensic pathologist from the practice, Dr. Rameen Starling-Roney, reviewed the autopsy report, other reports prepared by other medical experts that were reviewed as part of the autopsy and photographs, and testified at Crimi's trial about the opinions and conclusions he had reached. The Commonwealth continues:

> [A]t no time did [Crimi] object to Dr. Starling-Roney testifying about the findings of Dr. Bollinger during the autopsy while explaining the basis for his own conclusions. He certainly never suggested that in relying on Dr. Bollinger's report, it rendered Dr. Starling-Roney's testimony impermissible hearsay or violated his confrontation clause rights. Indeed, the only such objection raised was when Dr. Starling-Roney attempted to reference the findings of the neuropathologist who examined I.B.'s brain post-mortem, and whose findings were incorporated into the autopsy report. ***See*** N.T.[,] 10/5/2021, [at] 341-342. The trial court overruled that objection insofar as Dr. Starling-Roney explained that forensic pathologists frequently rely on the reports of medical professionals in forming their opinions regarding the cause and manner of death, including the type of report generated by the neuropathologist. [***See id.***]
>
> Aside from this specific objection with respect to the neuropathologist's report, [Crimi] never objected to Dr. Starling-

> Roney's reliance on Dr. Bollinger's autopsy findings generally, let alone on the basis of hearsay or a constitutional violation. Accordingly, this claim is waived on appeal. *See* Pa.R.E. 103(a) ([providing that a] party may claim error in admission of evidence only when [the] party makes a timely and specific objection).

Commonwealth's Brief at 41-42.

Crimi does not direct us to any place in the record where he properly preserved this evidentiary challenge, and the record supports the Commonwealth's conclusion that Crimi failed to lodge a timely objection to the testimony he now claims was inadmissible hearsay and violative of his confrontation rights. The claim is waived. *See* Pa.R.E. 103(a); Pa.R.A.P. 302(a) (stating that issues not raised in the trial court are waived and may not be raised for the first time on appeal.)

Next, Crimi claims the trial court erred in denying his post-sentence motion for acquittal or a new trial based on his assertions that the evidence was insufficient to support his third-degree murder conviction and that such a verdict was against the weight of the evidence. He asserts the evidence was insufficient because it was primarily based on Brown's credibility and her "self-serving statement that [I.B.] said 'bye mommy' before she left for work." Appellant's Brief at 60. He asserts the Commonwealth did not prove malice and offers only this single conclusory statement in support: "The Commonwealth did not [prove] malice through the evidence that was provided during trial." *Id.* at 61.

While Crimi does identify his third-degree conviction as the charge he seeks to challenge and does mention the element of malice in his appellate brief, he did not do so in his Pa.R.A.P. 1925(b) statement. In fact, again as the Commonwealth points out, Crimi's Rule 1925(b) statement did not identify the specific verdict or the specific element of any such verdict Crimi was alleging the Commonwealth had failed to prove. Instead, in his Rule 1925(b) statement, Crimi merely asserted: "The Trial Court erred in denying the motion for acquittal or a new trial based on sufficiency and weight of the evidence." Concise Statement of Matters Complained of on Appeal, 5/9/2022, at 1 (unpaginated).

> This Court has made clear:
>
> In order to preserve a challenge to either the sufficiency or weight of the evidence on appeal, an appellant's Rule 1925(b) concise statement must state with specificity the elements or verdicts for which the appellant alleges that the evidence was insufficient or against the weight of the evidence.

*Commonwealth v. Juray*, 275 A.3d 1037, 1048 (Pa. Super. 2022) (citation omitted). Otherwise, the issue is waived. *See id.*

Here, Crimi merely made the general assertion in his Rule 1925(b) statement that the trial court erred in failing to grant him relief based on his sufficiency and weight of the evidence claims, without identifying which charge or specific element or elements he was challenging. His sufficiency and weight claims are therefore waived. *See id.*

In his sixth claim of error, Crimi argues the trial court abused its discretion by sentencing him in the high end of the standard sentencing range. He essentially asserts the trial court's failure to duly consider his evidence of mitigation led to what he sees as an excessive sentence. This claim is also waived, but this time, it is for lack of development.

When an appellant raises claims challenging the discretionary aspects of his sentence, as Crimi does here, this Court will only review the claims if the appellant shows he filed a timely notice of appeal, properly preserved his claims at sentencing or in a post-sentence motion, included a statement pursuant to Pa.R.A.P. 2119 (f) in his brief, and raised a substantial question that his sentence is not appropriate under the Sentencing Code. *See Commonwealth v. Griffin*, 65 A.3d 932, 935 (Pa. Super. 2013) (defining a substantial question as one where the appellant advances a colorable argument that the sentencing court's actions were either inconsistent with a specific provision of the Sentencing Code or contrary to the fundamental norms underlying the sentencing process).

Crimi has met these requirements. He filed a timely appeal, preserved his claim in a post-sentence motion and included a Rule 2119(f) statement in his brief. He also cited a case supporting his contention that his claim that the trial court imposed an excessive sentence without duly considering mitigating circumstances raises a substantial question under the Sentencing Code. *See Commonwealth v. Raven*, 97 A.3d 1244, 1253 (Pa. Super. 2014) (stating

that an excessive sentence claim, in conjunction with an assertion that the sentencing court failed to consider mitigating factors, raises a substantial question).

Turning to the merits of Crimi's discretionary sentencing claim, we note that Crimi's Rule 2119(f) statement is focused on the fact that Crimi was 19 years old at the time of the offenses and the mitigating effect he believes his age should have had on his sentence. *See* Appellant's Brief at 18-20. However, in his argument section, Crimi cites general law on sentencing and then offers only this single sentence in support of his argument:

> At sentencing[,] evidence of mitigation was presented regarding [Crimi's] background, his age, his character, his low likelihood of reoffending, his lack of prior adult criminal record, advancing legal and scientific theory of youthful offenders' brain development reducing their risk to society as they mature, and his behavior and advancements during his period of incarceration.

Appellant's Brief at 64.

He then gives a stand-alone cite to the notes of testimony from his sentencing hearing where he presented evidence of mitigation. Despite providing this general list of, and general citation to, the mitigation evidence he presented at sentencing, Crimi does not specify in any meaningful way the mitigation evidence he presented or even attempt to explain how the trial court abused its discretion in how it considered this evidence. In fact, he does not make any argument at all regarding the trial court's discretion or abuse thereof. Moreover, Crimi's skeletal argument does not account for the fact that the trial court had the benefit of a presentence investigation report as well as

sentencing memoranda from Crimi and the Commonwealth, and heard from multiple witnesses at the sentencing hearing. Crimi's claim is woefully undeveloped, and it is waived for that reason. **See Love**, 896 A.2d at 1287.

Crimi's seventh and final claim is described by the Commonwealth as "convoluted," "nonsensical," and "waived." Commonwealth's Brief at 53. The claim involves a picture of I.B. taken by Brown after I.B. fell from her booster seat on November 24, 2017, the night before she was killed. Crimi alleges the Commonwealth "had access to the picture for years" but did not turn this picture over to Crimi during discovery. Appellant's Brief at 67. It appears he is claiming this intentional withholding of the picture constituted prosecutorial misconduct, although he does not explain how he was prejudiced or even what specific relief he is seeking. This claim, like his others, does not provide Crimi with any basis for relief.

In making his claim, Crimi acknowledges that at trial, Brown was shown Commonwealth Exhibit 8, a photograph, and Brown testified that the injury in that photograph is the one from when I.B. slid off her booster seat and hit her head on the table. **See** Appellant's Brief at 66; **see also** N.T., 10/5/2021, at 531. At that time, however, Crimi did not make any objection in relation to the photograph or Brown's testimony related to the photograph. In fact, Crimi does not point to any place in the record where he raised the Commonwealth's alleged misconduct related to this photograph before the trial court and before

he raised it on appeal. As such, this claim is waived. *See* Pa.R.E. 103(a); Pa.

R.A.P. 302(a).

As none of Crimi's claims on appeal merit relief, we affirm the judgment

of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/01/2023